2017 UT App 177

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
RUSSELL EDWARD YALOWSKI,
Appellant.

Opinion
No. 20150270-CA
Filed September 21, 2017

Third District Court, Salt Lake Department
The Honorable Robin W. Reese
The Honorable Paul B. Parker
No. 141903380

Alexandra S. McCallum, Attorney for Appellant

Sean D. Reyes, Laura B. Dupaix, and Jeanne B.
Inouye, Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN and KATE A. TOOMEY
concurred.

MORTENSEN, Judge:

¶1    Two loud bangs announced an unidentified intruder's
arrival at Victim's house. The short-lived mystery was solved
when Victim drew back the shower curtain to step out of her
bathtub. There stood her ex-boyfriend—Defendant Russell
Edward Yalowski. While urinating on the walls of the bathroom,
Defendant yelled that he had "about eight N words out[side]
waiting to shoot up the house." Defendant was charged and a
jury convicted him of burglary, a second degree felony; threat of
violence, a class B misdemeanor; and criminal mischief, a class B
misdemeanor. *See* Utah Code Ann. §§ 76-6-202, 76-5-107, 76-6-
106(2)(c) (LexisNexis 2012). Defendant appeals, and we affirm.

BACKGROUND

¶2 Defendant and Victim began dating in December 2012 and broke up one year later. On December 20, 2013, after the breakup, Victim was at home with her children, her cousin, and her cousin's children. Victim went upstairs to bathe, but, after a few minutes in the bathtub, she heard two loud bangs. When Victim opened the shower curtain, she saw Defendant standing in the bathroom. Defendant threatened her, saying he "had people outside" who were "waiting to shoot up the house," before "[h]e started urinating all over [her] walls near the shower."[1]

¶3 Victim dressed as she pleaded with Defendant "to calm down." As Defendant continued yelling, Victim made her way to her bedroom and dialed 911, setting the phone down because she felt she "couldn't talk" and "couldn't say anything because he was still standing there in the hallway." When Victim "got nervous that he might know that the phone was sitting off the hook," she "turned it off."

¶4 Eventually, Victim convinced Defendant to walk outside with her. Defendant continued threatening her, telling her "he was going to take [her] somewhere and beat [her] up and leave [her] for dead where nobody could find [her]." While the two were outside, police arrived and arrested Defendant. Officers found keys to Victim's house and car in Defendant's pocket, which Victim said she had never given him. Police took Defendant's shoes into evidence, and a forensic technician photographed shoe impressions in the snow around Victim's

---

1. Victim testified she could "see [Defendant's] genitalia" during this incident. Defendant was accordingly charged with lewdness, a class B misdemeanor, *see* Utah Code Ann. § 76-9-702(1) (LexisNexis Supp. 2016), but the jury acquitted Defendant on that charge.

house, damage to the back door of the house, and damage to the bathroom door.

¶5     Defendant was charged with lewdness, *see supra* ¶ 2 note 1, burglary of a dwelling, threat of violence, and criminal mischief. Before trial began, Defendant informed the trial court that he and the State had stipulated "that no prior acts of violence or abuse will be admitted." He also requested that the court "exclude any testimony that the shoe impressions found at [Victim's] home matched [Defendant's] footwear." He based his objection on rules 701 and 702 of the Utah Rules of Evidence, which differentiate between lay and expert opinion testimony. *See* Utah R. Evid. 701, 702. The court reserved ruling, indicating it would "have to rule on that when [it] hear[d] what the witness [said]." Finally, Defendant requested permission to cross-examine Victim about three prior instances of her dishonesty—a plea in abeyance for theft by deception, using someone else's identification to enter the jail to visit Defendant, and an arrest for theft by deception and giving a false name to a police officer. The court said it would allow Defendant to question Victim about her use of someone else's identification but denied Defendant's request to bring up the plea in abeyance or the arrest.

¶6     During trial, Victim testified that she and Defendant had broken up because Defendant was "constantly fighting with [her]. Getting violent." Defendant objected, arguing that the testimony violated the stipulation not to introduce evidence regarding his prior acts of violence. The court agreed and directed the prosecutor to speak to the witness, instructing her not to mention Defendant's past behavior. Defendant also moved for a mistrial, but the court explained, "I'm going to deny the motion, Counsel. I agree that it shouldn't have been brought up, but I don't see that there's significant harm. There was no description of any violent events. It was just a brief mention."

¶7     The State later called the forensic technician to testify. He explained that when he arrived at Victim's home, he observed

"some shoe impressions on the steps leading up to the back door" and "a small, faint shoe impression on the back door itself." He went on to testify, without further objection from Defendant, that the tread pattern shown on the pictures of the shoe impressions appeared to be a "similar pattern, similar block. Identical" to the pattern on Defendant's shoes.

¶8    The jury also heard testimony from Victim's cousin and responding police officers. Victim's cousin testified that she heard two loud bangs at Victim's house before finding out that Defendant was upstairs. Because she "was kind of afraid at first," she "tried to keep [the children] all in the same space." She and the children were "in the closet . . . hiding, because [she] heard [Victim and Defendant] arguing upstairs." After she felt it was safe to come out of the closet, she walked upstairs. She first saw that the frame of the back door was broken, and then she "noticed that the bathroom door was also broken." At trial, the cousin indicated that the damage to the back door and bathroom door had not previously been there.

¶9    The first officer (the backup officer) testified that he responded to Victim's house after multiple 911 hangups. He was a "backup officer," meaning his job was to "[m]ostly kind of stay out of the investigation. Make sure [the investigating officer was] safe. Make sure nothing happens to him or nobody resists him, or while he's conducting the investigation no one interferes with that." After Defendant was placed in a police car, the backup officer entered Victim's house and spoke with her. Victim showed him the damage inside the house and filled out a witness statement. The backup officer walked around the house, where he found one set of fresh footprints in the snow leading to the back door. He then "pointed out several things that needed to be photographed" to the forensic technician.

¶10    At trial, the backup officer took time to show and explain the resulting photographs to the jury. He pointed out characteristics of the shoeprints:

So right here there's flat, round, circular. And then around it several small circle lines. Right here is a void in the shoe, so an indent. On the top of it closest to the toes is somewhat curved. And in the back, right in here, there's another round impression, with a similar small one on the side.

He went on to explain that the details of the shoeprints were "[s]imilar to marks that we can see on the . . . door" and similar to the pattern on Defendant's shoes. He later reiterated that there were "white marks" on the door "that are similar to the ones in size and shape that we saw on the shoe print impressions. . . . [i]n the snow."

¶11    A second officer testified that he took Defendant's shoes into evidence. He also recounted his investigation, during which he saw Victim's bathroom door: "It looked like it had been forced open. The door jamb was broken, the latch plate was off." And the back door was "[j]ust basically kicked in."

¶12    The jury convicted Defendant of burglary, threat of violence, and criminal mischief, but it found him not guilty of lewdness. Defendant now appeals.


ISSUES AND STANDARDS OF REVIEW

¶13    Defendant raises three issues for our review, and he alternatively contends that the three issues, taken together, warrant reversal under the cumulative error doctrine. First, he challenges the trial court's denial of his motion for a mistrial when Victim testified, contrary to the parties' stipulation, that Defendant had been violent in the past.

Because a district judge is in an advantaged position to determine the impact of courtroom events on the total proceedings, once a district

court has exercised its discretion and denied a motion for a mistrial, we will not reverse the court's decision unless it "is plainly wrong in that the incident so likely influenced the jury that the defendant cannot be said to have had a fair trial."

*State v. Allen*, 2005 UT 11, ¶ 39, 108 P.3d 730 (quoting *State v. Wach*, 2001 UT 35, ¶ 45, 24 P.3d 948).

¶14 Next, Defendant challenges the trial court's refusal to allow him to question Victim about her plea in abeyance and her uncharged arrest. We review the trial court's decisions regarding the scope of cross-examination, including whether to exclude or allow the introduction of certain evidence, under an abuse of discretion standard. *See State v. Gomez*, 2002 UT 120, ¶ 12, 63 P.3d 72.

¶15 Defendant also challenges the admission of the forensic technician's testimony regarding the similarities between Defendant's shoes and the shoe impressions found at Victim's house. He argues that such testimony "required specialized knowledge" and that the technician was not qualified to provide such testimony. "We review decisions relating to the qualification of a witness as an expert or as a lay witness for an abuse of discretion." *State v. Rothlisberger*, 2004 UT App 226, ¶ 9, 95 P.3d 1193, *aff'd*, 2006 UT 49, 147 P.3d 1176.

¶16 Finally, Defendant argues that the errors he alleges, taken together, "undermine confidence in the fairness of [Defendant's] trial." "Under the cumulative error doctrine, we apply the standard of review applicable to each underlying claim or error" and "reverse only if the cumulative effect of multiple errors undermines our confidence that a fair trial was had." *State v. Davis*, 2013 UT App 228, ¶ 16, 311 P.3d 538 (citation and internal quotation marks omitted).

ANALYSIS

I. Victim's Testimony Regarding Defendant's Past Violence

¶17    First, Defendant argues that we should "reverse because the trial court improperly denied the defense's motion for mistrial after [Victim] testified about [Defendant's] prior acts of violence in violation of rule 404(b) of the Utah Rules of Evidence." The State counters that granting a mistrial was unnecessary because the statement "was unprompted, made in passing, and likely had no effect on the verdict." We agree with the State.

¶18    Under rule 404(b), "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." Utah R. Evid. 404(b)(1). In Defendant's view, Victim's testimony that Defendant "previously became violent constituted 404(b) evidence that was prejudicial." But because Victim's statement lacked detail, was not elicited by the prosecutor, and was not emphasized or dwelt on during trial, we conclude that Defendant was not prejudiced by the statement and that the trial court therefore did not abuse its discretion in denying Defendant's motion for a mistrial.

¶19    In *State v. Griffiths*, "the prosecutor unintentionally evoked a response which revealed the existence of an outstanding warrant for defendant's arrest in another unrelated matter." 752 P.2d 879, 883 (Utah 1988). The trial court immediately "admonished the jury to disregard the statement" and denied the defendant's motion for a mistrial. *Id.* On appeal, the Utah Supreme Court reasoned that "[w]hile it was error to introduce evidence of other wrong-doing by defendant," the error was harmless. *Id.* "The witness's reference to the warrant was very brief and was only made in passing, stating no details of the circumstances which caused the warrant to issue or of the offense to which it was related." *Id.*

¶20    Likewise, Victim's statement—that Defendant was "just constantly fighting with [her]. Getting violent"—was brief, was made in passing, and stated no details of Defendant's prior violence. *See id.* Victim did not explain how Defendant had been violent or how often.[2] Although the trial court did not instruct the jury to disregard Victim's statement,[3] the approach taken by the prosecutor was likely just as effective. The prosecutor immediately redirected Victim's testimony. Victim's entire statement was: "We were at my house and I broke up with him. I just told him I couldn't do it anymore. He was constantly accusing me of things I wasn't doing and just constantly fighting with me. Getting violent." The prosecutor followed up with the question, "You broke it up?", and Victim replied, "I broke it up." The prosecutor drew the focus away from any discussion of Defendant's past violence and instead focused on the fact that Victim was the one who ended the relationship with Defendant. No further mention was made of Defendant getting violent.

¶21    In *State v. Wach*, a witness had "violated the parties' stipulation not to introduce evidence of prior bad acts in accordance with rule 404(b) of the Utah Rules of Evidence" when she testified that she often wore a security alarm necklace when the defendant was around. 2001 UT 35, ¶¶ 44, 46 n.5, 24 P.3d 948. But this testimony "was not elicited by the prosecutor, and was an isolated, off-hand remark, buried in roughly 244 pages of testimony." *Id.* ¶ 46. And "given the totality of the evidence . . .

---

2. We note that Victim did use the word "constantly" to describe how often Defendant fought with her. She said that Defendant "was constantly accusing [her] of things [she] wasn't doing and just constantly fighting with [her]." However, Defendant does not argue that this sentence was improper or grounds for a mistrial. Instead, throughout his brief, he emphasizes the phrase "Getting violent" as being problematic.

3. We note that Defendant did not request a limiting instruction.

and the reasonable inferences therefrom," this statement did not "cause[] the jury to convict." *Id.* For these reasons, the Utah Supreme Court determined the challenged statement "did not render [the] trial so unfair that the trial court was 'plainly wrong' in denying [a] motion for a mistrial." *Id.*

¶22 Here, the prosecutor did not elicit Victim's statement that Defendant had gotten violent. The comment was spontaneously made, and the two words—"Getting violent"—are "buried in" more than 200 transcript pages. *See id.* The totality of the testimony presented by Victim, her cousin, the forensic technician, and the two responding police officers was more than sufficient to establish the elements of the crimes for which Defendant was convicted. We consider Victim's brief comment to be akin to the testimonies given in *Griffiths* and *Wach* and similarly conclude that the statement did not prejudice Defendant. Accordingly, the trial court did not abuse its discretion when it denied Defendant's motion for a mistrial.

## II. Cross-Examination of Victim

¶23 Next, Defendant complains that he should have been able to cross-examine Victim regarding her plea in abeyance for theft by deception and an arrest for both giving a false name to a police officer and theft by deception. Defendant bases this challenge on rules 608(b), 608(c), and 403 of the Utah Rules of Evidence.

¶24 As a threshold matter, we agree with the State's contention that Defendant's rule 608(c) challenge is unpreserved. That rule provides, "Bias, prejudice or any motive to misrepresent may be shown to impeach the witness either by examination of the witness or by other evidence." Utah R. Evid. 608(c). On appeal, Defendant argues that these events "reveal a motive to testify untruthfully." But to preserve this challenge for our review, Defendant must have "provide[d] the trial court with the opportunity to address, and correct, a claimed error" by

raising it "specifically." *See State v. Crabb*, 2011 UT App 440, ¶ 2, 268 P.3d 193 (per curiam).

¶25 When Defendant sought permission to question Victim about the plea in abeyance and the arrest, he did so "under Rule 608, which allows examples of conduct probative of truthfulness or untruthfulness." Rather than alerting the trial court that Defendant sought admission under rule 608(c), this explanation actually tracks the language of rule 608(b), which allows cross-examination about "specific instances of a witness's conduct . . . if they are probative of the character for truthfulness or untruthfulness of . . . the witness." *See* Utah R. Evid. 608(b). Defendant thus preserved only his rule 608(b) argument.[4] We therefore turn to the question of whether the trial court abused its discretion under rule 608(b) when it refused to allow cross-examination regarding Victim's plea in abeyance and arrest.

¶26 We have previously indicated that "the cross-examination of a witness is not wholly unrestrained, especially when inquiring about prior bad acts that did not result in the conviction of a crime." *State v. Valdez*, 2006 UT App 290, ¶ 9, 141 P.3d 614. And under rule 608(b), "no party is *entitled* to inquire of a witness's prior bad acts. The trial court is afforded broad discretion to allow or disallow inquiry concerning the witness's prior bad acts, even if probative of the witness's truthfulness or

---

4. Defendant states in conclusory fashion that even if his rule 608(c) challenge is unpreserved, "the court plainly erred by precluding cross-examination on [Victim's] plea in abeyance and 2014 arrest." But Defendant's one-paragraph analysis of the applicability of the plain-error exception to our preservation rules is unpersuasive. It fails to address rule 608(c) specifically and Defendant instead applies his analysis to "any aspect of this issue [that] is not preserved." Defendant's plain-error argument is thus inadequately briefed and we decline to consider it further.

untruthfulness." *Id.* (emphasis in original). In *Valdez*, even where the "case turn[ed] largely on [the witness's] credibility," we concluded that the trial court did not abuse its discretion "by prohibiting cross-examination into [a] dismissed charge." *Id.* ¶¶ 10, 12.

¶27 The present case is akin to *Valdez*. Defendant sought to cross-examine Victim about an arrest for which she had not yet been charged and "a plea in abeyance that was eventually dismissed." Obviously, rule 608(b) does not require a conviction before a prior bad act can be introduced. But the fact that there was no charge brought and the fact that the plea in abeyance was dismissed weigh against allowing cross-examination because they lessen the probative value of the events. *See* Utah R. Evid. 403; *State v. Gomez*, 2002 UT 120, ¶ 34, 63 P.3d 72 (discussing the interplay between rules 403 and 608(b) of the Utah Rules of Evidence).

¶28 Nevertheless, Defendant disagrees and claims that Victim's "prior acts of dishonesty are highly probative of her character for untruthfulness." He further argues that "the danger of unfair prejudice did not substantially outweigh the strong probative value." But in this regard, Defendant's argument seems to assume that the trial court's exclusion of these two prior acts was based solely on rule 403. *See* Utah R. Evid. 403 (allowing a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice"). The record does not indicate that the trial court made such a determination.[5] Instead, the probative value of the

_____

5. The trial court's order on this point does not explain its reasoning. For instance, we find it curious that the court allowed inquiry into Victim's use of a false identification but disallowed inquiry into the arrest and plea in abeyance, without explaining why. But curious as that may be, the decision was nevertheless squarely within the trial court's discretion.

arrest and plea in abeyance seems to have factored into the trial court's exercise of its discretion in not allowing the cross-examination under rule 608(b). It permitted Defendant to question Victim about her use of a false identification, which was recent. Furthermore, this use of false identification occurred when Victim visited Defendant while he was in jail for reasons related to the events of this case. By contrast, the trial court did not have before it information regarding when the plea in abeyance took place. And the arrest, although fairly recent, had not yet resulted in charges and lacked detail concerning the precipitating events. In other words, this is not a scenario in which "there is no reasonable basis for the decision" of the trial court and thus its decision does not constitute an abuse of discretion. *See Tschaggeny v. Milbank Ins. Co.*, 2007 UT 37, ¶ 16, 163 P.3d 615 (citation and internal quotation marks omitted).

¶29 We also conclude that the trial court's exclusion of the requested cross-examination was harmless. This case bears another similarity to *Valdez* because while the trial court limited cross-examination, it did not leave Defendant entirely unable to impeach Victim's credibility. *See* 2006 UT App 290, ¶ 10 (reviewing a trial court's refusing cross-examination about dismissed charge but allowing questioning on prior conviction). And while in *Valdez* the case hinged on the witness's credibility, *see id.*, here, Victim's testimony was not as crucial. She provided the details of where she found Defendant and the threats he made to her, and her story was corroborated by witnesses whose credibility was not attacked.

¶30 Victim's cousin testified about Defendant's presence in the house, about the damage done to the doors after his arrival, and about the arguing that she heard between Defendant and Victim. During the incident, Victim's cousin was fearful enough that she hid with her children in a closet. The jury received physical evidence showing the damage to the doors, including pictures and testimony regarding shoeprints left on the door and the shoes Defendant was wearing when he was arrested.

¶31 Defendant's ability to question Victim about her use of false identification, combined with the plentiful testimony supporting Defendant's convictions, leads us to conclude that there is no "likelihood that injustice resulted" from the limitations placed on Defendant's cross-examination of Victim. *See id.* ¶ 12 (citation and internal quotation marks omitted). Thus, there was no abuse of discretion nor a harmful error.

### III. The Forensic Technician's Opinion Testimony

¶32 Finally, Defendant argues that the trial court erred "by admitting lay opinion testimony regarding shoe impression evidence that required specialized knowledge and was not helpful to the jury." Specifically, he argues that the forensic technician should not have been able to compare and analyze the shoe impression evidence because it "failed to assist the jury and required specialized knowledge." In other words, Defendant argues that the forensic technician's testimony violated rule 701 of the Utah Rules of Evidence. We conclude that it did not, but even if it did, the testimony was harmless.

¶33 Rule 701 allows "a witness [who] is not testifying as an expert" to give "testimony in the form of an opinion" so long as the opinion is (1) "rationally based on the witness's perception;" (2) "helpful to clearly understanding the witness's testimony or to determining a fact in issue; and" (3) "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Utah R. Evid. 701. Before trial, Defendant moved to exclude "testimony from one of the police officers that shoe prints match [Defendant's] footwear . . . because [he] believe[d] that's appropriate for an expert under 702 and [not] a lay witness." The trial court explained that it would

> have to rule on that when I hear what the witness
> says, I guess. Just initially without having heard
> any evidence, I think that a layperson could say
> something to the effect that "That footprint looks a

> lot like his shoe." But if the witness is going to say, "I've done an expert examination, I've matched[6] tread" and so forth, then he probably couldn't go that far.

Then, during his testimony, the forensic technician explained, "On the tread pattern this similar pattern, similar block. Identical." On cross-examination, he clarified that he was "not testifying as an expert today, [he was] testifying as the person who gathered this evidence."

¶34 Even assuming that the trial court understood Defendant's objection[7] to pertain to the forensic technician's testimony—which is unclear because the motion referenced "one of the police officers" and two witnesses testified regarding the shoeprints—the opinion given was proper lay opinion testimony. *See id.* R. 701; *State v. Ellis*, 748 P.2d 188, 190–91 (Utah 1987). In *Ellis*, the Utah Supreme Court determined that the lay opinion given by a security guard and former police officer describing shoeprints did not run afoul of rule 701. *See* 748 P.2d

---

6. In fact, when the backup officer used the word "match" while discussing tread patterns during his testimony, the trial court sustained an objection and sua sponte struck the statement from the record.

7. Despite Defendant's motion in limine, we are not convinced this particular challenge was preserved. His motion referenced testimony opining that shoeprints matched Defendant's shoes, but he was not any more specific than that. He did not even indicate which particular witness he anticipated would provide such testimony. Furthermore, when the forensic technician offered his testimony that the shoeprints were "Identical," Defendant made no objection. But because we are able to resolve this issue on its merits, we do not consider further whether this issue was properly preserved.

at 190–91. And while Defendant attempts to distinguish the present case from *Ellis* because of the forensic technician's use of the word "identical," in our view, *Ellis* is dispositive of this issue.

¶35    In *Ellis*, the defendants argued

> that the trial court erred when it admitted the lay opinion testimony of Bruce Austin. Mr. Austin, a security guard and former police officer, was one of the first to arrive at the scene. He examined the premises and discovered two sets of footprints in the mud beneath the broken window, as well as footprints inside the house leading away from the broken window. During his testimony, Mr. Austin compared the footprints outside the house to those inside. He said that one exhibit, a photograph of a footprint "with the distinctive heel marking appeared to be the one on the inside of the carpet." The trial court admitted the testimony, reasoning that a witness is allowed to testify from personal experience and observation.

*Id.* at 190. "Based on that testimony," the defendants argued "that Mr. Austin gave an opinion which, as a lay witness, he was not qualified to give. They also argue[d] that the slight probative value of the opinion was far outweighed by the danger that the jury construed it as that of an expert and gave it undue weight." *Id.* at 191. The supreme court reasoned:

> Rule 701 of the Utah Rules of Evidence allows a lay witness to give an opinion when it is rationally based on the witness's perception and helpful to a clear understanding of the testimony or the determination of a fact in issue. Utah R. Evid. 701. It is difficult to understand how Mr. Austin's lay testimony in the form of an opinion became expert testimony. Simply because a question might be

> capable of scientific determination, helpful lay testimony touching on the issue and based on personal observation does not become expert opinion. It is true that "if [a question] is capable of scientific determination, then expert testimony is admissible with respect to it"; however, that does not mean that lay opinion testimony is prohibited if the provisions of the evidentiary rule are met.

*Id.* (additional citations omitted).

¶36 Like the defendants in *Ellis*, Defendant argues in part that the forensic technician was not qualified to give the challenged testimony because he "brought no legitimate methodology to bear in drawing the inference that the shoe impressions were identical" and he did not conduct "the type of subtle analysis that qualified him to comment, using terms of certainty, on the degree of similarity between complex tread patterns." But in making this argument, Defendant misstates the forensic technician's testimony. The witness merely explained his process of taking photographs of the scene and then opined that the pattern on the shoes was consistent with the pattern on the shoe impression. He did not opine "using terms of certainty" or about the "degree of similarity" between the patterns. He stated that the patterns appeared identical and then demonstrated, using the exhibits, how the patterns were "consistent" or "similar."

¶37 In other words, regarding comparisons between Defendant's shoes and shoeprints found at Victim's home, "[s]imply because [the] question might be capable of scientific determination, helpful lay testimony touching on the issue and based on personal observation [did] not become expert opinion." *Id.* Instead, the forensic technician based his opinion on his personal observations, and the jury was provided the very photographs on which he expressed his opinion. It was made clear to the jury that the forensic technician was not an expert witness, and there was nothing prohibiting jurors from forming

their own conclusions based on their observation of the photographs. Instead, the forensic technician's testimony merely helped them to focus on important aspects of the photographs. *See* Utah R. Evid. 701(b) (specifying that lay opinion testimony should be "helpful to clearly understanding the witness's testimony").

¶38 Additionally, nearly identical testimony was introduced through the backup officer, and that testimony was not challenged at trial nor is it challenged on appeal. The backup officer testified that the tread marks on the door were similar to the tread on Defendant's shoes. That witness also walked the jury through the pictures taken at Victim's house, pointing out details of the marks the same way the forensic technician did. Thus, even without the forensic technician's testimony, the jury would have had the same information before it and likely would have reached the same conclusions.

¶39 Because the forensic technician's testimony was based on his personal observations, was helpful to the jury, and was not the sort of testimony subject to rule 702, it was proper opinion testimony under rule 701. Furthermore, because the same testimony was offered by another witness, admission of the forensic technician's testimony was harmless.

IV. Cumulative Error

¶40 Defendant also makes a claim of cumulative error. Under the cumulative error doctrine, [appellate courts] will reverse only if the cumulative effect of the several errors undermines our confidence . . . that fair trial was had." *State v. Dunn*, 850 P.2d 1201, 1229 (Utah 1993) (omission in original) (citation and internal quotation marks omitted). "In assessing a claim of cumulative error, we consider all the identified errors, as well as any errors we assume may have occurred." *Id.* But if the appellant's claims do not constitute error, or the errors are "so minor as to result in no harm, the doctrine will not be applied."

*State v. Gonzales*, 2005 UT 72, ¶ 74, 125 P.3d 878. Because we have determined in every instance that either no error occurred or that any error was harmless, our confidence in the fairness of Defendant's trial is not undermined. Accordingly, we reject Defendant's cumulative error claim.

## CONCLUSION

¶41 We conclude that there is no merit to Defendant's challenges on appeal. Victim's statement that Defendant had previously been violent was not dwelt upon, was made in passing, and likely had no effect on the proceedings. Defendant's inability to cross-examine Victim regarding her arrest and plea in abeyance was not harmful, particularly where he was able to cross-examine her about her use of false identification and where other witnesses corroborated her testimony. And the forensic technician's testimony that the pattern on Defendant's shoes was identical to the mark left on Victim's door did not run afoul of the relevant rules of evidence and was harmless in any event.

¶42 Affirmed.

_____