2019 UT App 105

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
DOUGLAS JOHN HULSE,
Appellant.

Opinion
No. 20150298-CA
Filed June 13, 2019

First District Court, Brigham City Department
The Honorable Thomas Willmore
No. 141100180

John Robinson Jr., Attorney for Appellant

Sean D. Reyes and Karen A. Klucznik, Attorneys
for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and JILL M. POHLMAN concurred.

ORME, Judge:

¶1      Douglas John Hulse (Defendant) appeals his convictions for aggravated assault and unlawful detention. He argues that he received ineffective assistance of counsel because his attorney (Trial Counsel) failed to investigate and use his victim's prior fraud conviction to attack her character for truthfulness, failed to object to allegedly improper expert testimony, failed to object to inadmissible evidence of his abusive nature, and failed to object to inappropriate comments made by the State during closing argument. We affirm.

## BACKGROUND[1]

¶2 Defendant and the victim (Victim) were in a turbulent on-again, off-again relationship spanning over 14 years. In 2014, the couple spent Memorial Day weekend camping in Brigham Canyon, where they both ingested "a lot of drugs." By early morning of the following Tuesday—May 27, 2014—Victim wanted to return to their home in Tremonton. Victim testified that she had not used any drugs that morning, but she believed that Defendant had.

¶3 On their way home, the couple decided to visit Defendant's father at a construction site in Brigham City. On the way there, Defendant and Victim started arguing and yelling at each other. Victim testified that such arguments were common when Defendant used drugs. Upon arrival at the construction site, Defendant tried to pull Victim out of the Jeep, but Victim put the vehicle into drive and drove off, heading to Tremonton without Defendant. Victim had almost made it home when her Jeep ran out of gas on the interstate. She texted Defendant, and he brought her some gas—the record does not reveal how. They soon recommenced their arguing. Instead of continuing to Tremonton, they headed back to the construction site in Brigham City for Defendant to retrieve some tools from his father. At the site, Defendant placed the tools between the Jeep's two front seats. The couple had not ceased arguing, so Defendant's father—who at trial described the two as "out of control" and probably "on something"—requested that they leave.

---

1. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Daniels*, 2002 UT 2, ¶ 2, 40 P.3d 611.

¶4    Defendant and Victim next pulled into a gas station in Brigham City. Defendant grabbed the keys out of the ignition and began walking around. Victim, wanting to go home, began yelling at Defendant and demanding to know where the keys were. Defendant replied that he did not have them. The gas station clerk soon approached them and requested that they move their vehicle because it was blocking traffic at the pumps. Frustrated, Victim continued to demand that Defendant return the keys to the Jeep, and Defendant continued to insist that he did not have them. They were both "screaming and yelling" at each other. After approximately 45 minutes, Defendant, who apparently no longer had the keys or at least pretended he did not, was able to start the Jeep by "hot-wiring" it with a screwdriver.

¶5    Defendant and Victim then left the gas station and headed toward Tremonton, with Defendant behind the wheel. During the drive home, Victim "tr[ied] to be quiet and stay calm" because she knew Defendant was irritated with her. Defendant kept giving Victim "dirty looks," mumbled that he hated her, said that it was her fault that he was like this, and called her a whore. Victim testified that Defendant had previously told her that men should not hit women but that "whores deserve to be beat and die."

¶6    Defendant eventually pulled the Jeep over in Deweyville. Victim immediately became fearful and attempted to escape the vehicle, but Defendant grabbed her by the hair and pulled her back inside. He told her that if she knew "what's good for [her], [she] better stay in the . . . f'ing vehicle." He then put Victim in a headlock, bent her over toward him, and started "pounding on" her with his fist and a pellet gun. Defendant hit her in the ribs, on the back, and on the back of her head. Victim managed to break away briefly, but Defendant again grabbed her and slammed her face down onto the tools that he had stored between the seats. One of the tools cut

her, leaving a gash across her forehead. While once more holding Victim in a headlock, Defendant pointed the screwdriver he had used to hot-wire the Jeep at her head; again called her a "whore"; and told her "[she] deserved to die, [she'd] be better off dead," and "[her] kids would be better off if [she] was dead." Fearing for her life, Victim managed to escape from Defendant's grasp and ran toward the road. Defendant did not pursue her, but he shouted for her to return to the vehicle.

¶7 Victim was able to convince the driver of a passing truck, who had stopped to see if she needed help, to give her a ride to Tremonton. Once home, one of her neighbors drove her to the emergency room. Although Victim did not sustain a concussion or broken bones, the assault left her covered in cuts and bruises. The hospital notified the authorities, and Deputy Archuletta and Deputy Palmer soon arrived. They discussed the assault with Victim and took photographs of her injuries.

¶8 Defendant was arrested later that evening. While being interrogated by Deputy Palmer, Defendant admitted to being with Victim at the construction site and gas station in Brigham City earlier that day. During the course of the interrogation, however, Defendant gave two differing answers as to where he had last seen Victim. At one point, he told Deputy Palmer that he had last seen her in Deweyville—the location of the assault. But at another time, he stated that he last saw her at the gas station in Brigham City. When Deputy Palmer asked about Victim's injuries, Defendant first stated that "she gets bruises at work."[2] But after the deputy recounted Victim's account to Defendant, he responded, "If she said so."

---

2. Victim acknowledged to the police that she does get bruised at work, but she insisted that the bruises in the photographs "were

(continued…)

¶9     The State charged Defendant with one count of aggravated assault, a third-degree felony, *see* Utah Code Ann. § 76-5-103(1), (2)(a) (LexisNexis 2014), and one count of unlawful detention, a class B misdemeanor, *see id.* § 76-5-304(1), (4). Defendant pled not guilty to both charges. He was tried in February 2015.

*The Prosecution Case*

¶10    In its case-in-chief, the State relied on Victim's testimony, photographs of Victim's injuries, the two deputies' testimonies, and a video recording of Defendant's interrogation.[3] Victim's injuries were difficult to discern in the photographs, and the State acknowledged that the injuries were "hard to see." For that reason, the State asked Deputy Archuletta, who took the photographs, to describe each photograph to the jury.

¶11    In laying the foundation for Deputy Archuletta's testimony, the State asked generally about her training and experience. After she replied that she was P.O.S.T. certified,[4] the State inquired whether she had "receive[d] training

---

(…continued)

not from work." The record does not disclose the nature of her job, in connection with which bruising is commonplace.

3. The audio portion of the recording left much to be desired. The judge noted that "there seems to be a lot of mumbling and the recording is poor," but he overruled Defendant's objection to its admissibility based on this deficiency.

4. "P.O.S.T." is an acronym for "Peace Officer Standards and Training," the program by which law enforcement officers in Utah are trained and certified. *See* Utah Code Ann. § 53-6-205 (LexisNexis 2015); *id.* § 53-13-105 (Supp. 2018).

in injuries involving domestic violence." Deputy Archuletta responded that she had. The State later asked how many domestic violence calls she had responded to during her 17 years of service. Deputy Archuletta responded that she "would not want to even guess" but that "[she'd] had numerous" calls of that nature. The State inquired whether some of the calls involved injuries, to which she replied affirmatively. It then asked whether she knew "the difference between fresh injuries and old injuries," and Deputy Archuletta responded that she did.

¶12    After laying this foundation, the State requested that Deputy Archuletta describe each photograph to the jury and asked whether the injuries depicted in the photographs were "fresh." For example, the following exchange addressed exhibit 2:

> [Deputy Archuletta]: Okay. Right here, she had like psoriasis right here and you can see off to the inner portion of the knee fresh markings, red markings. This is a —has, I guess, an abrasion has taken a portion of the psoriasis off. You can see through, up through here like a—more still on the kneecap, the line of like a, I don't know, some type of a dragging, but there's—and this isn't clear here, but there's a line through here and then red up into here.
>
> . . . .
>
> [The prosecutor]: But this spot right here and these spots right here that you pointed to outside of the psoriasis, would you consider those fresh?
>
> [Deputy Archuletta]: . . . [Y]es, this is fresh . . . .

For the other exhibits, Deputy Archuletta indicated that the photographs showed "fresh" injuries, including redness on the back of Victim's head, right arm and wrist, left rib, chin, jaw, nose, right cheekbone, right eye, neck, shoulders, and clavicle. She also identified some scratches, an abrasion on Victim's kneecap, "road rash" and the "stippling of . . . blood vessels" on Victim's right neck and shoulder area, and a fresh injury behind her left ear. Deputy Archuletta also identified some "old bruising" on Victim's left leg.

¶13   Trial Counsel did not object to the content of Deputy Archuletta's testimony as a whole, but he did object twice during the course of her testimony. Trial Counsel first objected when the State asked Deputy Archuletta to estimate a time frame for one of Victim's injuries. He next objected to the speculative nature of Deputy Archuletta's opinion concerning the cause of one particular mark. The district court sustained both objections. Trial Counsel did not cross-examine Deputy Archuletta.

¶14   The State next called Deputy Palmer to testify. Because Deputy Palmer was the officer primarily responsible for questioning Victim at the hospital about her injuries, his testimony mainly concerned that conversation and his later interrogation of Defendant. But the State did ask Deputy Palmer whether he was able to observe Victim's injuries at the hospital and whether they appeared to be "fresh." He responded in the affirmative to both questions.

*The Defense Case*

¶15   Defendant denied that the alleged assault ever took place. Rather, he claimed that Victim sustained her injuries during the camping trip from which they had returned that same day. Specifically, shifting from his initial bruising-at-work theory, he alleged that Victim sustained her injuries the night before while gathering firewood in dense underbrush. To corroborate this

theory, Defendant called a friend who had accompanied them on the camping trip. The friend testified that she and Victim had gone searching for firewood on the last night of the trip. She described the terrain as "pretty rough," full of rocks, trees, and fallen branches. As a result, the friend testified that she herself "hit [her] head a couple of times on the trees" and "had scratches all over [her]" arms and legs. Trial Counsel showed the photographs of Victim's injuries to the friend and asked whether they were consistent with the kinds of injuries the friend had sustained while gathering firewood. The friend replied, "Yeah. Definitely."

¶16 In addition to providing an alternative theory concerning the source of Victim's injuries, Trial Counsel attempted to impeach Victim's account in a number of ways. On cross-examination, Trial Counsel noted that although Victim had testified that Defendant had threatened her with a screwdriver, she made no mention of this in her written statement provided to the police on the day of the assault. To contradict Victim's claim that the tools were located between the two front seats of the Jeep at the time of the assault, Trial Counsel also called another of Defendant's friends as a witness. She testified that on the day of the assault, Defendant had walked to her house in Brigham City from the construction site and had asked whether he could leave his tools there. After he stayed at her house for approximately 45 minutes, she stated that she drove him to the gas station. Trial Counsel also called Defendant's mother as a witness. She testified that Victim was a "chronical liar" and that Victim admitted to her that, contrary to her denial at trial, she had also used drugs on the day of the assault. Finally, Trial Counsel called Victim as an adverse witness and successfully elicited testimony that she often threatened self-harm to manipulate Defendant.

¶17 Despite Trial Counsel's efforts, the jury convicted Defendant on both charges. He was sentenced to an

indeterminate term not to exceed five years on the aggravated assault charge and to a concurrent six-month term on the unlawful detention charge.

*Rule 23B Remand*

¶18   Defendant timely appealed his conviction. In conjunction with the opening brief, Defendant's prior appellate counsel filed a motion for remand under rule 23B of the Utah Rules of Appellate Procedure requesting an evidentiary hearing regarding four of Defendant's claims of ineffective assistance, which motion we granted. The four claims subject to remand included a claim for Trial Counsel's failure to investigate and present Victim's prior fraud conviction at trial. Following the hearing, the district court held that all four of the ineffective assistance of counsel claims "fail[ed] one or both elements of the [*Strickland*] test."

¶19   Shortly after the rule 23B hearing, current appellate counsel was substituted for prior appellate counsel. With the stipulation of the State and our approval, current appellate counsel filed a replacement brief in which he pursued only one of the four claims of ineffective assistance that were the subject of the rule 23B remand, namely the fraud matter. As such, the claim of ineffective assistance for failure to investigate and use Victim's prior fraud conviction is the only claim dealt with in the rule 23B hearing that is currently before us. Therefore, we address that matter and three other claims of ineffective assistance newly pursued on appeal, and so we have only limited occasion to consider the rule 23B hearing.

ISSUES AND STANDARDS OF REVIEW

¶20   Defendant alleges that Trial Counsel rendered ineffective assistance of counsel when he (1) failed to investigate and use

Victim's prior fraud conviction to impeach her testimony at trial, (2) failed to object to Deputy Archuletta's improper expert testimony, (3) allowed the State to introduce inadmissible character evidence of Defendant's abusive behavior, and (4) failed to object to inappropriate comments made by the State during closing argument. Defendant's first claim of ineffective assistance was subject to the rule 23B remand. *See* Utah R. App. P. 23B. "In ruling on an ineffective assistance of counsel claim following a Rule 23B hearing, we defer to the district court's findings of fact, but review its legal conclusions for correctness." *State v. King*, 2017 UT App 43, ¶ 13, 392 P.3d 997 (quotation simplified). The remaining claims were not subject to the remand. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *Layton City v. Carr*, 2014 UT App 227, ¶ 6, 336 P.3d 587 (quotation simplified).

ANALYSIS

¶21 "To ensure a fair trial, the Sixth Amendment of the U.S. Constitution guarantees [to a criminal defendant] the right to effective assistance of counsel." *State v. Campos*, 2013 UT App 213, ¶ 23, 309 P.3d 1160. To prevail on an ineffective assistance of counsel claim, a defendant must first establish that "counsel's performance was deficient." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel's performance is deficient when it falls below an "objective standard of reasonableness," *id.* at 688, which requires a defendant to "overcome the strong presumption that his trial counsel rendered adequate assistance by persuading the court that there was *no conceivable tactical basis* for counsel's actions," *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162 (emphasis in original) (quotation otherwise simplified). We will therefore "not second-guess trial counsel's legitimate

strategic choices, however flawed those choices might appear in retrospect," *State v. Tennyson*, 850 P.2d 461, 465 (Utah Ct. App. 1993), "unless there is no reasonable basis supporting" those decisions, *Clark*, 2004 UT 25, ¶ 6 (quotation simplified).

¶22    After a defendant overcomes the high threshold of demonstrating that his counsel performed deficiently, he must next "show that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. Counsel's deficient performance is prejudicial if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A defendant's inability to establish either element defeats a claim for ineffective assistance of counsel." *State v. Reid*, 2018 UT App 146, ¶ 19, 427 P.3d 1261.

## I. Prior Fraud Conviction

¶23    Defendant first alleges that Trial Counsel rendered ineffective assistance by not investigating the facts underlying Victim's prior fraud conviction and not using that conviction to attack her character for truthfulness at trial. Victim had claimed benefits on behalf of children who no longer resided with her, and she was consequently convicted of workers' compensation fraud, a third-degree felony, in October 2011.[5] Defendant argues that Trial Counsel's failure to investigate and use her conviction to impeach Victim at trial was particularly egregious because, due to the he-said-she-said nature of the evidence, "the entire trial was . . . largely a test of [Victim's] credibility."

---

5. Although documentary evidence of Victim's conviction is not part of the record, the State stipulated at the 23B hearing that Victim was convicted of workers' compensation fraud in 2011.

¶24   Following the rule 23B hearing, the district court determined that Trial Counsel did not render ineffective assistance. We agree.[6] Trial Counsel's decision not to investigate Victim's prior fraud conviction or present it at trial did not prejudice Defendant's defense for two reasons.

¶25   First, although Trial Counsel did not use Victim's prior conviction to attack her character for truthfulness, he directly challenged the believability of Victim's testimony in a number of ways. On cross-examination of Victim during the State's case-in-chief, Trial Counsel noted that Victim made no mention of Defendant threatening her with a screwdriver in the written statement she made on the day of the assault. Later, during the defense case, Trial Counsel called Victim as an adverse witness and elicited testimony that she frequently threatened self-harm to manipulate Defendant. Trial Counsel also called a number of

---

6. In reaching this decision, the district court referenced Trial Counsel's testimony explaining that he did not bring up Victim's past fraud conviction because he did not wish the jury to perceive him as bullying a sympathetic victim. Determining this to be an effective trial strategy, the court concluded that Defendant's "assertion fails the first element of the ineffective assistance test." We affirm the district court's conclusion, but on different grounds. *See State v. Van Huizen*, 2019 UT 01, ¶ 39, 435 P.3d 202 ("An appellate court may affirm the judgment appealed from on any legal ground or theory apparent on the record.") (quotation simplified). Because Trial Counsel's decision not to investigate or use Victim's fraud conviction did not prejudice the defense, we do not reach the first element of the ineffective assistance test. *See Archuleta v. Galetka*, 2011 UT 73, ¶ 41, 267 P.3d 232 ("In the event it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, we will do so without analyzing whether counsel's performance was professionally unreasonable.") (quotation simplified).

witnesses who provided testimony that contradicted portions of Victim's version of events: Defendant's mother testified that Victim had admitted to also using drugs on the day of the assault; Defendant's father testified that both Defendant and Victim appeared to be under the influence of drugs that day; Defendant's friend testified that Defendant left his tools—one of which Victim testified to cutting her forehead on—at her house in Brigham City; and Defendant's co-camper friend testified that Victim's injuries were similar to those she herself had sustained on that same camping trip while finding and hauling firewood, thus providing an alternative explanation for Victim's injuries.

¶26    Given that Trial Counsel's efforts to directly contradict the content of Victim's testimony failed to sufficiently undermine her credibility in the eyes of the jury, we are not persuaded that it is reasonably probable that a limited mention of her prior workers' compensation fraud conviction, *see infra* ¶ 27, would have tipped the scales in favor of Defendant.

¶27    Second, although Trial Counsel did not know the specific details of Victim's fraud conviction, his limited knowledge of Victim's criminal past would have nonetheless allowed him to ask her whether she had ever been convicted of fraud.[7] But we are not convinced that the specific details and circumstances of Victim's fraud conviction that Trial Counsel's hypothetical investigation would have uncovered would have been admissible at trial. Had Trial Counsel chosen to attack Victim's character for truthfulness, he likely would have been permitted to introduce the specific details of her workers' compensation fraud conviction only if she first "attempt[ed] to explain away

---

7. When asked at the rule 23B hearing whether he knew of Victim's workers' compensation fraud conviction, Trial Counsel responded that he generally "knew that she had a fraud," but he did not investigate the matter any further.

the effect of the conviction or to minimize [her] guilt." *See State v. Alzaga*, 2015 UT App 133, ¶ 34, 352 P.3d 107 (quotation simplified). *See id.* ¶ 33 (stating that rule 609 of the Utah Rules of Evidence does not generally permit "an examining attorney [to] parade the details of the prior crime in front of the jury") (quotation simplified); *State v. Colwell*, 2000 UT 8, ¶ 33, 994 P.2d 177 ("When impeaching a defendant, it is permissible to inquire into the fact and nature of the prior conviction, but not the details or circumstances surrounding the event, absent unusual circumstances."). We decline to speculate whether Victim, if confronted with her prior fraud conviction, would have attempted to explain away or minimize the crime, thereby rendering the fruits of Trial Counsel's hypothetical investigation admissible. *See State v. Nelson*, 2015 UT 62, ¶ 10, 355 P.3d 1031 ("Proof that [trial counsel's] acts or omissions prejudiced [the defendant] must be a demonstrable reality and not a speculative matter.") (quotation simplified).

¶28    Thus, given Trial Counsel's many other efforts to directly contradict Victim's testimony and the limited way in which Trial Counsel would have been allowed to present the fruits of a hypothetical investigation, Defendant has not demonstrated a "reasonable probability of a different outcome at trial sufficient to undermine our confidence in the jury's verdict." *See State v. Garcia*, 2017 UT 53, ¶ 48, 424 P.3d 171.

## II. Expert Testimony

¶29    Defendant next argues that Trial Counsel furnished ineffective assistance by permitting Deputy Archuletta to give improper expert testimony. Defendant asserts that the State called Deputy Archuletta to testify as an expert without first notifying the defense and that Trial Counsel was therefore ineffective by failing to object to her testimony. *See* Utah Code Ann. § 77-17-13(1)(a) (LexisNexis 2015) (requiring any party in a felony case to give "notice [of its intent to use an expert witness]

to the opposing party as soon as practicable but not less than 30 days before trial"). In support of his contention that Deputy Archuletta testified in an expert capacity, Defendant points both to the foundation that the State laid in preparation for her testimony and to the content of her testimony.

¶30   Defendant first asserts that the State asked two expert-related questions when laying the foundation for Deputy Archuletta's testimony: whether she had received training in injuries involving domestic violence and whether she knew how to differentiate between new and old injuries. On that foundation, Defendant claims, Deputy Archuletta proceeded to give expert testimony. Defendant argues that although "not all of [Deputy] Archuletta's testimony was in the nature of an expert . . . many of her answers veered into [the territory of] forensic expert" testimony. Defendant points to Deputy Archuletta's use of "technical terms," such as "stippling of blood vessels" and "clavicle," and to her characterization of most of Victim's injuries as "fresh," which Defendant asserts "calls for some level of forensic expertise."

¶31   We disagree. Utah Code section 77-17-13(1)(a) did not apply to Deputy Archuletta's testimony because, despite the foundation laid by the State, the subject matter of her testimony fell within the confines of proper lay opinion. Trial Counsel therefore did not perform deficiently by not objecting to the deputy's testimony.

¶32   A lay witness may offer an opinion about matters that are "rationally based on the witness's perception," helpful to the jury in "determining a fact in issue," and "not based on scientific, technical, or other specialized knowledge." Utah R. Evid. 701. Lay opinion testimony is proper and an expert witness is not required if "an average bystander would be able to provide the same testimony." *State v. Rothlisberger*, 2006 UT 49, ¶ 34, 147 P.3d 1176. If the opinion testimony involves

"knowledge [that] is not within the ken of the average bystander," an expert witness is required. *Id.*

¶33 In the present case, the State asked Deputy Archuletta to describe the injuries in the photographs and to opine as to whether they were "fresh." Defendant recognizes that Deputy Archuletta's description of the injuries depicted in the photographs was nonexpert testimony[8] and challenges as improper expert testimony only the portions of her testimony where she used technical terms and characterized the injuries as "fresh."

¶34 Defendant identifies only two technical terms used by the deputy in her testimony: "stippling of blood vessels" and "clavicle." Even assuming, without deciding, that both qualify as technical terms, the use of a total of two such terms throughout

---

8. However, Defendant does challenge those nonexpert portions of Deputy Archuletta's testimony as independently inadmissible under rule 701 of the Utah Rules of Evidence. Rule 701 states that lay opinion is proper when it, among other things, helps the jury "to clearly understand[] the witness's testimony or to determin[e] a fact in issue." Utah R. Evid. 701(b). Defendant asserts that Deputy Archuletta's description of the injuries depicted in the photographs was unhelpful because "the jury could see the photos for themselves and use their shared experience to evaluate them." We disagree. Although the jury was certainly not prevented from forming its own conclusions based on its observations of the photographs, the extent of Victim's injuries was difficult to discern in the photographs. The jury therefore benefitted from hearing descriptions of the injuries from Deputy Archuletta—the person who took the photographs and was able to observe the injuries in person—because it helped focus the jurors on important aspects of the photographs.

the course of her entire testimony is insufficient to elevate her testimony to expert status.

¶35 More importantly, the average person is generally capable of differentiating new scratches and bruises from old scratches and bruises. As such, Deputy Archuletta's opinion as to the freshness of Victim's wounds was well "within the ken of the average bystander." *See id. Cf. State v. Lagasse*, 410 A.2d 537, 543 (Me. 1980) (holding that a witness's observation that the victim's "skin [was] swollen and red, it looked like she had been slapped" was proper lay opinion testimony because "[t]he bruises [the witness] observed are consistent in common knowledge with those which would be present on the face of one who had been 'slapped'"); *In re J.C.*, 892 S.W.2d 87, 89 (Tex. Ct. App. 1995) (holding that testimony regarding the age of bruises was properly admitted as lay opinion testimony). Having personally observed Victim's injuries at the hospital, Deputy Archuletta went no further than to state that she believed most of the injuries to be "fresh." On the few occasions that the State sought her opinion on matters that would arguably require specialized knowledge—when she was asked to estimate the timeframe of one injury and when she speculated as to the cause of another injury—Trial Counsel immediately objected, and the court sustained the objections.

¶36 Thus, despite the nature of the foundation that the State laid for Deputy Archuletta's testimony, we conclude that the subject matter of the testimony, to the extent it was opinion testimony at all, was lay opinion and well within the confines set by rule 701 of the Utah Rules of Evidence.[9] Trial Counsel

_____

9. Moreover, even if Deputy Archuletta's testimony had amounted to improper expert testimony, Trial Counsel still would not have been deficient for not objecting. Defendant cites *State v. Doutre*, 2014 UT App 192, 335 P.3d 366, in which we held

(continued…)

(…continued)

that "[t]rial counsel was . . . deficient for failing to object to the State's failure to give reasonable prior notice of [a witness's] expert testimony." *Id.* ¶ 29. However, we can conceive of a sound tactical basis in the present case for not objecting to the deputy's testimony, which was not the situation in *Doutre*. *Cf. id.* ¶ 21 ("[W]e cannot conceive of a sound [tactical] basis for failing to object [to expert witness testimony] on rule 702 grounds in this case."). Trial Counsel may have chosen not to object to Deputy Archuletta's testimony concerning Victim's injuries given his plan to later elicit similar testimony from Defendant's co-camper friend. Both Deputy Archuletta and Defendant's friend were shown pictures of Victim's injuries and were asked to opine about them. The State asked Deputy Archuletta to describe the injuries and to give her opinion whether they were "fresh." Similarly, Trial Counsel asked Defendant's friend whether Victim's injuries were consistent with those she had obtained while gathering firewood with Victim. We can readily conceive that a competent attorney in Trial Counsel's position may have deliberately chosen not to object to Deputy Archuletta's testimony in order to set a testimonial baseline that would help overcome potential objections to the content of Defendant's co-camper friend's testimony—especially considering that the friend's testimony was crucial in establishing the defense's alternate theory as to the source of Victim's injuries.

Furthermore, Deputy Palmer also testified that Victim's injuries appeared to be "fresh," but Defendant does not challenge his testimony on appeal. Therefore, at least for purposes of his ineffective assistance of counsel claims, Defendant was not prejudiced by Deputy Archuletta's testimony because "the jury would have had the same information before it and likely would have reached the same conclusions." *See State v. Yalowski*, 2017 UT App 177, ¶ 38, 404 P.3d 53.

therefore did not perform deficiently by not objecting to the testimony on that ground. *See State v. Akers*, 2018 UT App 235, ¶ 22, 438 P.3d 70 ("Defense counsel does not render deficient performance if counsel refrains from making futile objections.").

### III. Additional Claims

¶37 Defendant makes two additional claims of ineffective assistance of counsel.[10] First, Defendant argues that Trial

---

10. Defendant primarily argues these two claims in terms of the cumulative error doctrine. He alleges that the prejudicial effect of these two additional claims combined with the prejudicial effect of the claims discussed in sections I and II justify the application of the doctrine. *See State v. Perea*, 2013 UT 68, ¶ 33, 322 P.3d 624 ("We will reverse under the cumulative error doctrine only if the cumulative effect of the several errors undermines confidence that a fair trial was had.") (quotation simplified). Because we determine Trial Counsel did not perform deficiently in connection with the claims discussed in sections II and III.B., *see id.* ("[I]f [a defendant's] claims do not constitute error . . . we will not apply the doctrine."), it follows that even assuming Trial Counsel performed deficiently in the claims discussed in sections I and III.A., the prejudice that resulted from Trial Counsel's deficient performance is still insufficient to undermine our confidence that Defendant was given a fair trial. In ruling as we do, we rely on the limited way in which Trial Counsel would have likely been permitted to present the fruits of his hypothetical investigation to the jury. *See supra* ¶ 27. And we are mindful of the fact that the jury would still have heard testimony of Defendant's abusive behavior regardless of whether Trial Counsel objected to the second exchange. *See infra* ¶¶ 41–42; *State v. Martinez-Castellanos*, 2018 UT 46, ¶ 42, 428 P.3d 1038 (stating that "before reversing a verdict or sentence under the cumulative error doctrine," appellate courts "must

(continued…)

Counsel erred by allowing the State to introduce improper character evidence of Defendant's abusive nature. Second, Defendant claims that Trial Counsel performed deficiently when he did not object to inappropriate comments made by the State during its closing argument. We hold that neither claim supports a determination of ineffective assistance of counsel.

## A. Character Evidence

¶38 Defendant argues that by not objecting, Trial Counsel twice allowed the State to introduce otherwise inadmissible evidence of his abusive nature. He asserts that the evidence was inadmissible because he had not opened the door to evidence of that character trait.[11] *See* Utah R. Evid. 404(a)(1), (a)(2)(B); *State v. Leber*, 2009 UT 59, ¶ 13, 216 P.3d 964. The State also referenced this evidence during its opening statement and closing argument—again without Trial Counsel's objection.

¶39 The first instance occurred during the State's direct examination of Victim. The State asked Victim for the reason she surmised that Defendant had used drugs on the day of the assault, and this exchange ensued:

---

(…continued)
determine that (1) an error occurred, (2) *the error, standing alone, has a conceivable potential for harm*, and (3) the cumulative effect of all the potentially harmful errors undermines its confidence in the outcome") (emphasis added).

11. Although Defendant is correct in so stating with regards to the first and second exchanges, *see infra* ¶ 39, Defendant did open the door to evidence of that particular character trait in a third exchange that Defendant has not addressed on appeal, *see infra* ¶ 41.

> [Victim]: I know that there was still dope around with us.
>
> [The prosecutor]: And do you know his behavior?
>
> [Victim]: Evil.
>
> [The prosecutor]: Well, in terms of the drugs . . . was it consistent with that behavior?
>
> [Victim]: Yes.

Trial Counsel did not object to this brief exchange. The second instance occurred after Defendant called Victim as an adverse witness and elicited testimony that she often threatened self-harm in order to manipulate Defendant. During the State's cross-examination of Victim, the following exchange unfolded:

> [The prosecutor]: You mentioned in your testimony that you only got upset and threatened to hurt yourself when, in your words, "he beats the hell out of me?"
>
> [Victim]: Uh-huh (affirmative).
>
> [The prosecutor]: Is that what was happening [when you sent Defendant a text message threatening self-harm]?
>
> [Victim]: You know what, it started to get to where we went through a pattern . . . [proceeds to describe pattern of abuse].
>
> [The prosecutor]: So this behavior that you're talking about, on May 27th, 2014, the incident

we're talking about, was he in one of those moments?

[Victim]: He had been up, like I said, I know for six days for sure that he'd been up, maybe seven.

[The prosecutor]: Violent?

[Victim]: Very violent.

. . .

[The prosecutor]: And did this for 14 years?

[Victim]: He's been doing it for a lot longer.

Trial Counsel once more did not object to this line of questioning. Defendant argues that Victim's testimony about Defendant's prior abuse was inadmissible character evidence under rule 404(a) of the Utah Rules of Evidence because he had not opened the door to it and that Trial Counsel's performance was deficient because he allowed it to reach the jury. We disagree.

¶40 The first exchange during which Victim called Defendant "evil" was brief, unprompted, and quickly passed over by the State. It is conceivable that a competent attorney would have chosen not to draw the jury's further attention to the fleeting exchange by objecting to its content. *See State v. Spinks*, 2003 UT App 182U, para. 8 ("[I]t is conceivable that defense counsel opted for the sound strategy of not calling further attention to those remarks by objecting to them."); *State v. Shepherd*, 2015 UT App 208, ¶ 52, 357 P.3d 598.

¶41 Regarding the second exchange, Defendant has not demonstrated that Trial Counsel's failure to object to the exchange prejudiced his defense, particularly in light of a third

exchange that Defendant does not challenge.[12] This prior, third exchange occurred during the State's case-in-chief. While cross-examining Victim, Trial Counsel asked whether she hit Defendant at the gas station in Brigham City. Victim replied that she did not remember, but that it was possible. On redirect, the topic was revisited during this exchange:

> [The prosecutor]: Now, there was a discussion, [Trial Counsel] asked . . . if you hit [Defendant] when you were at [the gas station].
>
> [Victim]: Uh-huh (affirmative).
>
> [The prosecutor]: And you said, "I may have."
>
> [Victim]: I—I may have, I may not have. I honestly don't know and—
>
> [The prosecutor]: Is hitting each other typical of this relationship?
>
> [Victim]: Yes.
>
> [The prosecutor]: You wouldn't deny that you hit him before?
>
> [Victim]: Oh, I've hit him before.
>
> [The prosecutor]: And you wouldn't deny that he's hit you before?
>
> [Victim]: Oh, he's hit me many . . . times.

---

12. We do not decide whether Trial Counsel performed deficiently by not objecting to the second exchange.

¶42     In light of this third exchange, in which the jury heard testimony regarding Defendant's abusive behavior toward Victim, Defendant has failed to demonstrate how the second exchange prejudiced his defense. The jury had already heard testimony covering ostensibly the same subject matter as the second exchange and, in light of this, it is unlikely that a jury would have reached a different verdict had Trial Counsel objected to the second exchange. *Cf. State v. Yalowski*, 2017 UT App 177, ¶ 38, 404 P.3d 53 (stating that because "nearly identical testimony was introduced" by another witness, "the jury would have had the same information before it and likely would have reached the same conclusions").

B.     Prosecutorial Misconduct

¶43     Defendant lastly challenges Trial Counsel's failure to object to an inappropriate statement the State made during closing argument. Toward the middle of its rebuttal, the State referenced the 14 years of abuse by Defendant that Victim had suffered, stating,

> Finally, finally, finally, she comes forward and she says, "I've had enough, I'm done." And that's why we're here today, not because she was a drug addict, not because she liked [being] abused, because she finally said, "I don't want this life anymore. Help me." That's why we're here.

Defendant argues that this statement amounted to prosecutorial misconduct and that Trial Counsel performed deficiently by not objecting or taking other action to address the misconduct.

¶44     "When we review an attorney's failure to object to a prosecutor's statements during closing argument, the question is not whether the prosecutor's comments were proper, but *whether they were so improper* that counsel's only defensible choice was to

interrupt those comments with an objection." *State v. Houston*, 2015 UT 40, ¶ 76, 353 P.3d 55 (emphasis in original) (quotation otherwise simplified). Although the State's comment likely did cross the line in terms of proper argument, it was not so improper as to render Trial Counsel ineffective for not objecting to it. Moreover, there appears to be a sound tactical basis not to object to the statement.

¶45 The challenged statement was in the middle of the rebuttal portion of the State's closing argument. The statement was followed by a lengthy discussion of, among other things, the evidence, the credibility of Defendant's witnesses, and the elements of the crime. An appeal to the jurors' emotions and sense of duty to protect Victim was certainly not the main focus of the rebuttal. Trial Counsel therefore may well have chosen not to object to the statement to avoid highlighting Defendant's past abuse of Victim to the jury. *See State v. Hummel*, 2017 UT 19, ¶ 110, 393 P.3d 314 ("[T]he law recognizes the prerogative of opposing counsel to swallow their tongue [during closing argument] instead of making an objection that might have the risk of highlighting problematic evidence or even just annoying the jury."). Accordingly, Trial Counsel did not perform deficiently by not objecting to the statement made by the State during rebuttal.

CONCLUSION

¶46 Defendant did not receive ineffective assistance in any of the four instances to which he has directed our attention. Defendant was not prejudiced by Trial Counsel's failure to investigate the underlying facts of Victim's fraud conviction, because the fruits of the hypothetical investigation would very likely have been inadmissible at trial. Trial Counsel did not perform deficiently by not objecting to Deputy Archuletta's testimony regarding Victim's injuries, because it did not amount

to expert testimony. Defendant has not demonstrated that he was prejudiced by the admission of evidence of his abusive behavior toward Victim, because such evidence was admitted at a different point during trial. Finally, the inappropriate statement made by the State during closing argument was not so egregious as to require competent counsel to object.

¶47    Affirmed.

————