**2024 UT App 108**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
KRISTY LEE WHITCHURCH,
Appellant.

Opinion
No. 20200938-CA
Filed August 1, 2024

Eighth District Court, Duchesne Department
The Honorable Samuel P. Chiara
No. 181800358

Emily Adams and Freyja Johnson,
Attorneys for Appellant

Sean D. Reyes, John J. Nielsen, Christopher A. Bates,
and Andrew F. Peterson, Attorneys for Appellee

JUDGE JOHN D. LUTHY authored this Opinion, in which
JUDGES GREGORY K. ORME and RYAN M. HARRIS concurred.

LUTHY, Judge:

¶1 Kristy Lee Whitchurch appeals her convictions for murder, aggravated assault, and aggravated burglary. She argues that she was denied the effective assistance of counsel due to several alleged failings of her trial counsel (Counsel) during the presentation of her case below. After considering each of Counsel's alleged failings, we are not convinced that any of them amounted to deficient performance resulting in prejudice. We therefore affirm.

## BACKGROUND[1]

¶2      On the evening of April 6, 2018, Kristy[2] and her husband were returning to Roosevelt, Utah, after a day trip to Colorado, making several stops along the way. Later that same evening, various members of Kristy's family were arrested for violently assaulting Roy and Sandra,[3] a couple who had once been friends of Kristy's brother Thomas and his wife, Samantha. Sandra subsequently died as a result of the injuries she received during the assault.

### *The Backstory*

¶3      According to Samantha, she and Thomas had previously been close with Roy and Sandra, but the two couples eventually "went [their] separate ways." About a year after the couples drifted apart, Thomas and Samantha's four-year-old son (Son) told Samantha that Roy had sexually abused him and that Sandra had watched. The abuse was not initially reported to police, however, because Son "begged [Samantha] not to" do so. Eventually, after several years, Son "said he was ready to call the cops," and Samantha then reported the abuse to police.

¶4      One evening, "probably . . . about three weeks" after the report to police and without any arrests having been made, family

---

1. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Daniels*, 2002 UT 2, ¶ 2, 40 P.3d 611.

2. Because there are various family members involved in the underlying events of this case—many of whom share a common last name—we use given names for clarity.

3. Pseudonyms.

members were gathered at the home of Kristy's mother (Mother), discussing the subject of Roy and the alleged abuse. Son was there, sitting on Thomas's lap, and Thomas asked him, "Do you want Dad to beat him up?" Son answered, "Yeah," and several family members immediately responded by heading out the door, at about 9:00 p.m., to go to Roy and Sandra's house. Samantha drove her white van, with Thomas in the passenger seat and Stephanie (Thomas and Kristy's sister) and Byron (Stephanie's fiancé) in the back.

*The Attack*

¶5     After the "ten minutes or less" drive to Roy and Sandra's house, Thomas jumped out of the van and headed for the front door. When he reached the door, "he hit it with both of his fists," shattering the glass, and entered the house, with Samantha and Byron close behind. Roy and Sandra had run out the back door when they realized Kristy's family was approaching, and Thomas, Samantha, and Byron followed them into the backyard.

¶6     Thomas and Byron attacked Roy, with Thomas "punching him in his sides" and Byron also hitting him, including "with a piece of wood." Samantha chased after Sandra, who exited the backyard through a side gate. Stephanie—who had remained outside and was by now wielding a baseball bat—and Samantha were then able to corner Sandra. Samantha "grabbed [Sandra] by her hair," "dragged her down to the ground," and "started hitting her." Samantha "punched her five or six times" and "kicked her once" in "her shoulder blade area." Stephanie then "brought the bat up over her head and brought it down and hit [Sandra] in the head with it."

¶7     Kristy's cousin (Cousin) was also allegedly present for the attack, although he purportedly did not arrive in the same vehicle as the other four. The timing of Cousin's alleged involvement is not entirely clear, but at some point, he was said to have kicked

Sandra "in probably the back of her head" and Roy "in the face." Byron also, at some point, left his attack of Roy and "kicked [Sandra] in the face" as well. Samantha was likewise "going back and forth between" Roy and Sandra and at one point kicked Roy "[i]n his side."

¶8     The attack lasted for less than ten minutes. Then the family members fled the scene, throwing the bloodied bat out of the van window during the return trip to Mother's house.

¶9     One of Roy and Sandra's neighbors had heard the commotion and called 911 at 9:23 p.m. While on the phone with 911, the neighbor asked Sandra who had attacked her, and, although it was "very hard to understand her" (likely due to her injuries), Sandra identified the family generally and Thomas and Samantha specifically as her attackers.[4] Police then arrived and asked Roy who had attacked him and Sandra. He specifically identified Samantha, Thomas, Byron, and Cousin (who was later acquitted), but he also referenced both the family generally and the "sisters" as having been involved.

*Samantha's Disclosure of Kristy's Involvement in the Attack*

¶10     Police arrested Thomas, Samantha, Stephanie, Byron, and Cousin and charged them with attempted aggravated murder, aggravated assault, and aggravated burglary. After Sandra succumbed to her injuries about two weeks after the attack, the charges were amended from attempted aggravated murder to aggravated murder.

¶11     That September, while Samantha was in jail awaiting trial, Son attempted suicide. His suicide attempt "kind of turned everything around for [Samantha]." She began thinking about

---

4. Sandra was life-flighted to the hospital and died before police were able to interview her.

"the guilt of all this" that Son was experiencing, and she "came to the decision that [she] needed to try to do the right thing" and tell "the truth about what [had] happened" on the night of the attack. So although in previous interviews with police and discussions with her attorneys Samantha had refused to tell "about anything that anyone other than [she] and [Thomas] had done that night," she then became willing to discuss the involvement of other family members. It was at this point that Samantha disclosed to her attorneys and police that Kristy had also participated in the attack.

¶12 Following this disclosure and Samantha's "willingness to accept responsibility," she entered into a plea agreement with the State wherein she was able to plead guilty to the reduced charge of second-degree manslaughter in exchange for her cooperation as a witness for the State. Also following the disclosure, the State arrested Kristy and charged her with murder, aggravated assault, and aggravated burglary.

¶13 Kristy thereafter filed a Notice of Alibi, explaining that on the evening of the attack, she had been traveling back from Colorado with her husband. She said they left Dinosaur, Colorado, at approximately 7:00 p.m. and that they made several stops along the way, including two stops at rest areas as well as stops in Vernal, Utah, to buy "some pizza to take home" and "dog food for their dogs." After that, she said, they stopped at Mother's house to drop off the pizza, visited with Mother and Kristy's bedridden dad, and then went home, arriving there after 10:00 p.m.

*The Trial*

¶14 At trial, the State's first witness was Samantha, who testified regarding the attack as set forth above. However, she also included details of Kristy's involvement that night. Samantha testified that Kristy had also been at Mother's house before the

attack and that she had left with the others when they headed to Roy and Sandra's house. Samantha said Kristy did not ride in Samantha's van, and Samantha was not entirely sure how Kristy arrived at Roy and Sandra's house. But she testified that Kristy owned a newer, small, gray SUV at that time.[5] In any event, Samantha remembered that Kristy had participated in the attack, using a hammer to hit Sandra "in like her hip area" as well as to hit Roy "in his lower back area."

¶15 As part of its initial examination of Samantha, the State asked her about a letter she had written to a male jail inmate in April or May of 2019 explaining why she was in jail. The State then moved to have the letter admitted as evidence, and Counsel responded that he had no objection and that he was "going to refer to it" during cross-examination.

¶16 During cross-examination, Counsel did ask Samantha about the letter, emphasizing its elements that cast Samantha and the victims of the attack in an unfavorable light—specifically, the letter's indication that Samantha was carrying on "a romantic type of relationship" with a man in prison even though she was married and the letter's graphic description of the sexual abuse allegedly perpetrated by Roy against Son while Sandra watched.

¶17 On redirect examination, the State asked Samantha to read the entire letter to the jury, saying, "[I]t's important that we hear the whole thing, to kind of know the context." Samantha then read the entirety of the four-page letter. The portion of the letter relating the attack states as follows:

> So one night (April 6, one year ago tonight) Tommy
> & I decided we were going to go beat their asses. His

---

5. Samantha also briefly mentioned that Kristy owned a second car: "She also had a Mustang, but I don't believe she had it that night. I don't really remember."

sister & bro-in-law rode with us. We chased them through their house, caught up to them outside. Tommy had [Roy] so I went after [Sandra], grabbed her, took her to the ground & punched her 5 or 6 times[,] kicked her once, & that was it. As I turned to go check on Tommy, his sister hit [Sandra] in the head with a baseball bat. His other sister and cousin showed up, his sister had a hammer, and trying to make a long story shorter they both got beat pretty bad.

¶18 Roy was the next to testify. He explained the tension that had existed between him and Kristy's family in the years prior to the attack due to Son's abuse allegations. Roy specifically testified about a time when he had encountered Kristy in a store and she had told him, "I ought to shoot you." Roy testified that although he had tried to tell her that the allegations were not true, Kristy had still continued to talk of violence:

She just start—"Well, we can fight this. We can go fight," and you know, "You ought to die. I ought to kill you." She was going to—said, "But it won't just be me," you know. I'm like, "Yeah, I know. It won't just be you if we go and fight."

¶19 Roy then related the details of the attack, also remembering that Kristy was an active participant. He testified that at the beginning of the attack, Kristy was one of the family members who had kicked him. He also said that he remembered that as Kristy was kicking him, she had said, "You touched my nephew."

¶20 The State also presented the testimony of a deputy who had investigated the attack (Deputy). Deputy testified that he had "worked with the sheriff's office probably 12 or 13 years" and had a "little over 17 years" of "total law enforcement experience." Among other things, Deputy further testified about his

background in investigations and answered some specific questions related to bruises he had seen on Roy's back following the attack:

> Q. In your career [in] law enforcement do you know approximately how many different assault cases you've responded to?
>
> A. Oh, numerous.
>
> Q. Do you have an approximate number?
>
> A. Over 30 easily, but I don't have an exact number.
>
> Q. But you've responded to more than one assault case?
>
> A. Yes.
>
> Q. In those cases have you seen where—incidents where people have been hit with bats?
>
> A. Yes.
>
> Q. How about with hammers?
>
> A. I don't think a hammer, but I have with many other blunt objects.
>
> Q. What type of marks do you typically see from those blunt objects?
>
> A. They're consistent with the shape of the object.
>
> Q. Is there anything else that might change what— possibly what marks are left when they're hit with something?

A. Yes, the type of clothing, the angle of the blow, whether it was a glancing or a ricochet or direct impact. If it was half on a belt and half off, things like that.

Q. As part of your investigation in this case, were there some distinct marks left on [Roy]?

A. There was.

Q. What were those?

A. Little round circle[s] that were consistent with the head of [a] hammer.

. . . .

Q. What are you seeing in those pictures?

A. That would be a picture of [Roy's] back.

Q. What marks do you see on that back?

A. Lots of different areas that are starting to bruise. Some have the little circles in them that are consistent with the hammer.

¶21 Deputy also testified regarding interviewing Roy and obtaining a written statement from him. In connection with that, Deputy related his experience and opinions regarding the way people commonly respond in interviews and when giving statements after a traumatic event:

Q. Okay, in your experience as a law enforcement officer how many interviews have you done in your job?

A. Hundreds.

Q. Okay, have you interviewed people after they've been assaulted?

A. I have.

Q. Or experienced or witnessed a traumatic event?

A. I have.

Q. During those interviews after either being assaulted or witnessing a traumatic event is it uncommon for people to leave out details?

A. It's very common.

Q. Why is that, based on your experience?

A. Your body reacts to everything differently. So with trauma sometimes there's certain parts of our body that shut down. You can fight, you can flight, you can freeze. They call it traumatic for a reason. So you—there's just a lot happening and a lot to take in all at once.

Q. As your job as a law enforcement [officer] have you had people fill out witness statements before?

A. Many, many times.

Q. Is it uncommon for people to leave out details in written witness statements?

A. It's too common for them to leave out details.

Q. Based on your experience, why is that?

A. Generally we don't like to write anymore, is what it seems like to me, but when we're talking we're

faster. So it's easier to stay on track than when we're writing. So when you're writing, you're going slower than what you can process. So [you] just leave things out. It just happens.

¶22 Kristy testified in her defense. She said that on the day of the attack, she had traveled with her husband to Colorado to buy lottery tickets and go to a marijuana dispensary. The lottery tickets, which were introduced at trial, were time-stamped as having been purchased at 6:16 p.m. and 6:17 p.m. Kristy testified that on their way home, she and her husband made frequent stops, including stops in Vernal, Utah, to purchase pizza and do some shopping. Kristy thought they left Vernal around 9:00 p.m. Kristy then detailed arriving at Mother's house with the pizza, visiting with her dad and Mother for about ten minutes, teasing her nephews for a few minutes, and then leaving to go to her own home. She testified that on her way out of Mother's house, she saw Samantha returning to the house and Thomas outside smoking.

¶23 On cross-examination, the State showed Kristy a video from a security camera on a school building that showed a road close to Mother's house. The video showed a vehicle that looked like Samantha's white van driving along the road at 9:10 p.m. in the direction of Roy and Sandra's house, followed closely by another vehicle that the State suggested looked like Kristy's gray SUV. Kristy denied that the second vehicle looked like her SUV, differentiating the two based on characteristics of her SUV that she said did not match the vehicle in the video.

¶24 The remainder of Kristy's defense relied on testimony from other family members. One testified that on the night of the attack, Kristy had arrived at Mother's house with pizza after Samantha and Thomas had exited the house. Mother testified that Thomas had gotten angry at one point on the night of the attack, that he and Samantha had then gone outside, and that Kristy brought

pizza sometime after that. Kristy's husband also testified, but he could not remember much about the events of that day due to "problems with memory" that were "connected to [an] injury and fall in the oil field."

¶25 Ultimately, the jury convicted Kristy on all three counts, and she was thereafter sentenced to concurrent prison terms. Kristy then timely appealed.

*The Rule 23B Remand*

¶26 On appeal and in relation to one of her ineffective assistance of counsel claims, Kristy moved for a rule 23B remand. *See* Utah R. App. P. 23B(a) ("A party to an appeal in a criminal case may move the court to remand the case to the trial court for entry of findings of fact, necessary for the appellate court's determination of a claim of ineffective assistance of counsel."). Her relevant ineffective assistance claim concerns the security camera video that captured Samantha's van and another vehicle driving toward Roy and Sandra's house at 9:10 p.m. Kristy claims that a later portion of the same video shows a car that looks like a yellow Ford Mustang she owned at the time also driving toward Roy and Sandra's house "one minute after the assault finished." Kristy argues that this later portion of the video, if it had been shown to the jury, would have supported her alibi defense because if the car in that portion of the video was her Ford Mustang and if she had been driving it, that would confirm that Kristy could not have been at Roy and Sandra's house at the time of the attack.

¶27 We granted the rule 23B motion and temporarily remanded the case to the district court for further findings. The district court held an evidentiary hearing and issued findings related to when Counsel first received and reviewed the security camera video and why the later portion of the video was not presented to the jury.

¶28 The court found that "Counsel was not aware of [the video] until trial" and that "Counsel does not recall why he was not aware of [the video] until trial." Relatedly, the court found that "[t]he prosecutor told [Counsel] that the video had been provided in discovery and emailed to [Counsel]"; that "Counsel was having some problems with his email at the time, and sometimes he would have to call the prosecutor's office for assistance"; and that "Counsel believed the prosecutor sent [the video] to him in an email that was not properly flagged for his review by his staff." After Counsel became aware of the video at trial, and "shortly before it was admitted," he reviewed with Kristy the portion of the video that the State intended to present to the jury. They did not review the entire video, and Counsel did not request additional time to review the entire video.

¶29 The court further found that Kristy "did not say anything to [Counsel] before, during, or after trial about owning a Ford Mustang"; that Kristy "did not tell [Counsel] that she was driving a Ford Mustang on the day or evening in question"; and that Kristy "did not tell [Counsel] . . . that the car she and her husband took to Colorado was not [her SUV]." And apparently with reference to when Counsel learned during trial of the existence of the video, the court found that "Counsel had the impression that [Kristy's] husband drove the . . . silver or white SUV[] on the trip to Colorado the day of the assault and that [Kristy] rode as a passenger, although there was no specific testimony at trial about which car [Kristy] and her husband drove that day." Finally, the court found that "[t]he car in [the later portion of] the video appears to be a different color and lack the striping of [Kristy's] Mustang."

## ISSUES AND STANDARD OF REVIEW

¶30 Kristy raises several claims of ineffective assistance of counsel, which she asks us to consider both individually and

cumulatively. Specifically, she finds fault with Counsel's failure to make three different objections to Deputy's opinion testimony: (1) an objection to Deputy's expert opinion testimony on the ground that it was impermissible anecdotal statistical evidence, (2) an objection to Deputy's opinion testimony regarding the impact of trauma on memory, and (3) an objection to Deputy's opinion testimony regarding the bruising on Roy's body. Kristy also finds fault with Counsel's failure to object to Samantha reading the jailhouse letter as part of her testimony and to the letter's subsequent introduction into evidence. Finally, Kristy finds fault with Counsel's failure to introduce the later portion of the security camera video that showed the yellow car. "An ineffective assistance of counsel claim raised for the first time on appeal presents a question of law, which we review for correctness." *State v. Cook*, 2017 UT App 8, ¶ 5, 391 P.3d 391 (cleaned up).

ANALYSIS

¶31    "To prevail on an ineffective assistance of counsel claim, a defendant must meet the two-prong *Strickland* test: (1) counsel's performance was objectively deficient and (2) the deficient performance resulted in prejudice." *State v. Fleming*, 2019 UT App 181, ¶ 9, 454 P.3d 862 (citing *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984)), *cert. denied*, 462 P.3d 803 (Utah 2020). "Because both prongs of the *Strickland* test must be met to establish ineffective assistance of counsel, we need not always address both prongs." *Id.* (cleaned up).

¶32    In considering the first prong—whether counsel performed deficiently—our review "must be highly deferential." *Strickland*, 466 U.S. at 689. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate

the conduct from counsel's perspective at the time." *Id.* We therefore "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, . . . that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (cleaned up). "We give wide latitude to trial counsel to make tactical decisions and will not question such decisions unless there is no reasonable basis supporting them." *State v. Gallegos*, 2020 UT 19, ¶ 34, 463 P.3d 641 (cleaned up).

¶33 As to the second prong—whether prejudice resulted—"[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Instead, "a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Id.* at 696.

¶34 We consider in turn each of Kristy's claims of ineffective assistance of counsel. We ultimately conclude that each claim fails under at least one of the prongs of the *Strickland* test.

I. Deputy's Opinion Testimony

¶35 Kristy first asserts that Counsel provided ineffective assistance by failing to object to Deputy's "unqualified and improper expert testimony." Specifically, she contends that Counsel performed deficiently by not objecting to Deputy's testimony that it is "very common" for witnesses to leave out details when they are first interviewed after a traumatic event and his testimony that it is "too common" for people to omit details when writing witness statements, arguing that this testimony was inadmissible anecdotal statistical evidence. She also contends that Counsel performed deficiently by not objecting to Deputy's testimony regarding the effect of trauma on memory and his testimony regarding the cause of Roy's bruising because both

constituted unqualified expert testimony. We address Kristy's contentions in turn and conclude, as to each, that Counsel did not perform deficiently.

A.     Anecdotal Statistical Evidence

¶36    Kristy contends that Counsel performed deficiently by not objecting to Deputy's testimony that it is "very common" for witnesses to leave out details after experiencing a traumatic event and "too common" for people to omit details when writing witness statements, because such testimony amounts to anecdotal statistical evidence. This testimony was apparently designed to provide a reason for Roy's failure initially to identify Kristy as one of the people involved in the attack. Kristy relies on *State v. Rammel*, 721 P.2d 498 (Utah 1986), to argue that Deputy's testimony in this regard amounted to impermissible anecdotal evidence and that Counsel rendered ineffective assistance by not objecting to the testimony on that ground.

¶37    In *Rammel*, a detective testified that "[b]ased on his experience interviewing several hundred criminal suspects," it was his opinion that "no criminal suspect ever admitted 'right off the bat' to committing a crime" and, therefore, that "it would not have been 'unusual' for [the witness] to lie during the first police interrogation." *Id.* at 500. The *Rammel* trial court "held that [the detective] was an expert apparently qualified to testify on [a particular witness's] capacity for telling the truth and admitted the evidence." *Id.* On appeal, our supreme court held that the trial court's ruling was "erroneous for several reasons," only one of which Kristy relies on here: namely, that evidence related to a witness's character for truthfulness "must go to *that* individual's character for veracity" and must not "invite[] the jury to draw inferences about [one person's] character based on [an

officer's] past experience with other suspects."[6] *Id.* A reasonable attorney could have concluded, however, that the testimony given by Deputy in this case is materially distinguishable from the testimony given by the deputy in *Rammel* and, thus, that an objection to Deputy's testimony on the basis that it invited an impermissible inference would have been unavailing.

¶38 The detective in *Rammel* had been deemed an expert as to another witness's "*capacity for telling the truth*" and testified that "it would not have been 'unusual' for [the witness] to *lie* during [his] first police interrogation." *Id.* (emphasis added). The detective's testimony thus "invited the jury to draw inferences about [the witness's] *character*." *Id.* (emphasis added). In contrast here, there is a strong argument that Deputy's testimony did not invite the jury to draw inferences about Roy's character or capacity for telling the truth. Instead—as Kristy herself contends—Deputy's testimony arguably invited the jury to instead infer that when Roy was first interviewed he *could not remember* some details about the attack—including Kristy's involvement—and that "[i]t just happen[ed]" that he did not write these details in his initial statement because "[g]enerally [people] don't like to write anymore" and their "slower" writing is unable to keep up with "what [they] can process" mentally.

¶39 Indeed, several months before Kristy's trial, we issued an opinion in *State v. Nunez-Vasquez*, 2020 UT App 98, 468 P.3d 585,

---

6. Kristy identifies one of the other reasons why the supreme court held the anecdotal statistical evidence in *Rammel* to be inadmissible—i.e., because its "foundation was utterly lacking" since "[t]here was no showing that the anecdotal data from which the detective drew his conclusions had any statistical validity." *State v. Rammel*, 721 P.2d 498, 501 (Utah 1986). But Kristy never explicitly argues that Deputy's testimony was inadmissible on this basis, and to the extent that she meant to make that argument, it is inadequately briefed.

*cert. denied*, 474 P.3d 945 (Utah 2020), distinguishing that case from *Rammel* on very similar facts. In *Nunez-Vasquez*, a nurse "provided anecdotal testimony, based on her general experience, as to why [a victim] may have *forgotten* major portions of [a] sexual assault." *Id.* ¶ 66 (emphasis added). We said that the nurse's testimony about memory was materially different than the *Rammel* detective's testimony, which was "directly [about] the witness's 'capacity for telling the truth.'" *Id.* And because the nurse's testimony "did not comment on [the victim's] veracity," we held that her "anecdotal testimony" "was not improper." *Id.*

¶40 Given that Deputy's testimony in this case arguably related to memory and what "just happens" when people write witness statements and not to any particular person's capacity for telling the truth, reasonable counsel in this case could have determined, based on *Nunez-Vasquez*, that an objection to Deputy's testimony on the ground that it invited an impermissible inference would be unavailing and, thus, elected not to make that objection. *See generally State v. Huey*, 2022 UT App 94, ¶ 53, 516 P.3d 345 ("Our role in this appeal is not to categorically determine if [the evidence was] inadmissible . . . . Rather, we must determine whether reasonable counsel, when considering all the circumstances, could have determined that [the evidence was admissible] and decided to forgo an objection on that basis." (cleaned up)). Accordingly, Kristy's ineffective assistance claim based on Deputy's anecdotal statistical testimony fails.[7]

---

7. Kristy also cites *State v. Lewis*, 2020 UT App 132, 475 P.3d 956, which addressed testimony more similar to Deputy's testimony here. In *Lewis*, two officers testified that based on their experience interviewing hundreds of sexual assault victims, it was common for there to be "variations when victims give multiple accounts of their assaults." *Id.* ¶¶ 11–12. However, while we noted that the officers' testimony in *Lewis* "potentially [ran] afoul of [*Rammel*],"

(continued…)

B.      Testimony Regarding Memory and Trauma

¶41    Kristy further contends that Deputy was unqualified to give expert testimony regarding the effect of trauma on memory and that Counsel therefore rendered ineffective assistance by not objecting to Deputy's testimony on that topic. We conclude that competent counsel could have decided not to object to Deputy's testimony on this ground and, thus, that Counsel did not perform deficiently in this regard.

¶42    Under rule 702(a) of the Utah Rules of Evidence, "a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Utah R. Evid. 702(a). "We have routinely allowed persons to testify as experts based on the totality of their qualifications and experience, and not on licensing or formal standards alone." *State v. Kelley*, 2000 UT 41, ¶ 15, 1 P.3d 546. "An officer can therefore qualify as an expert to testify on [a particular] subject based on the officer's training *or* experience *or* some combination of the qualifications listed in rule 702(a)." *State v. Prettyman*, 2024 UT App 20, ¶ 21, 544 P.3d 1059 (emphasis added), *cert. denied*, 550 P.3d 996 (Utah 2024).

¶43    Deputy testified that he had "worked with the sheriff's office probably 12 or 13 years" and had a "little over 17 years" of "total law enforcement experience" at the time of trial. He testified that during that time, he had conducted "[h]undreds" of interviews, which number included "numerous" people—"[o]ver 30 easily"—who had specifically experienced an assault and

we ultimately resolved that case on other grounds. *Id.* ¶¶ 17 n.2, 51. Our recognition of a *potential Rammel* issue in that case does not alter our analysis that the testimony here did not clearly violate *Rammel* as Kristy claims.

additional people who had "experienced or witnessed [some other] traumatic event." Deputy further testified that "[m]any, many times" he had also asked people to fill out witness statements. Having heard that account of Deputy's relevant experience, Counsel could reasonably have believed that Deputy either already had established or could establish through additional questioning sufficient expertise, based on his experience, to allow him to testify as an expert regarding witnesses' ability generally to recall and express the details of traumatic events shortly after those events. Counsel could have therefore strategically decided against objecting based on an assertion that Deputy lacked relevant expertise, so as to not "thereby allow [Deputy] to amplify [his] credibility by relating additional qualifications under questioning by the State." *Id.* ¶ 24.

¶44 After Deputy had testified to his relevant experience, he opined that it is "very common" for people to "leave out details" when relating a traumatic event. Then he explained the reason for his opinion:

> Your body reacts to everything differently. So with trauma sometimes there's certain parts of our body that shut down. You can fight, you can flight, you can freeze. They call it traumatic for a reason. So you—there's just a lot happening and a lot to take in all at once.

¶45 We recognize that the *explanation* Deputy gave for his opinion—that it is very common for people to leave out details when relating a traumatic event—at least hinted at a medical or neurologic basis for that opinion. And Kristy correctly points out that the State "never qualified Deputy as an expert on repressed memory, medicine, or the effect of trauma on the brain." Thus, Counsel could have objected on this ground to Deputy's explanation for *why* it is very common for people to leave out details when relating a traumatic event. However, Counsel could

have reasonably believed that the result of such an objection would have been, at a minimum, to highlight the explanation to the jury and to allow the State to elicit another explanation, one drawn from Deputy's relevant experience. Counsel might also have reasonably recognized the possibility that the State might instead have been able to elicit from Deputy additional qualifications, in the form of specialized knowledge, education, or training that he might have received on the subject over the course of a rather lengthy law enforcement career. For these reasons, Counsel could have reasonably made the strategic decision not to object to the lack of foundation for Deputy's explanation for his expert opinion and, instead, let that brief testimony pass un-highlighted and un-augmented. *See State v. Nunes*, 2020 UT App 145, ¶ 20, 476 P.3d 172 ("Counsel may well have made a reasonable tactical choice in forgoing the objection even if there may have been grounds to object. Thus, the dispositive question is whether counsel's actions fell below an objective standard of reasonableness . . . ." (cleaned up)), *cert. denied*, 485 P.3d 943 (Utah 2021).

¶46    In short, Kristy has not established the deficient performance element of her ineffective assistance claim based on Deputy's testimony regarding the effects of trauma on memory. Hence, that claim fails.

C.    Testimony Regarding Bruising

¶47    Kristy asserts that Deputy was also unqualified to give expert testimony regarding the cause of Roy's bruising because Deputy "had no medical qualifications and never investigated a hammer assault" and that Deputy's testimony about Roy's bruising also was not permissible lay opinion testimony because, generally, "[a]n average bystander cannot testify about what caused a bruise on another person." Because Kristy believes that Deputy's testimony about Roy's bruising was inadmissible as both expert opinion testimony and lay opinion testimony, she

asserts that Counsel's failure to object to Deputy's testimony on this point amounted to ineffective assistance. We disagree and conclude that Deputy's testimony on this point was admissible as lay opinion testimony.

¶48   Under the Utah Rules of Evidence, both lay and expert witnesses may give opinion testimony. Utah R. Evid. 701, 702. Rule 701 provides that for a lay witness to give "testimony in the form of an opinion," that testimony must be "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge." *Id.* R. 701. Rule 702 addresses testimony provided by experts, that is, testimony that *is* based on "scientific, technical, or other specialized knowledge." *Id.* R. 702. Thus, "the test for determining whether testimony must be provided by an expert is whether the testimony requires that the witness have scientific, technical, or other specialized knowledge; in other words, whether an average bystander would be able to provide the same testimony." *State v. Rothlisberger*, 2006 UT 49, ¶ 34, 147 P.3d 1176.

¶49   Hence, the test of whether expert testimony is required is "based on the level of knowledge that witnesses have from which they can draw their conclusions." *Id.* "If that knowledge is not within the ken of the average bystander, then it is properly characterized as specialized knowledge" and testimony based on that knowledge may be given only by an expert. *Id.* Such specialized knowledge includes, for example, knowledge as to what quantity of drugs typifies personal drug use, *see id.* ¶ 36, and knowledge as to how square footage is calculated in commercial real estate, *see Clifford P.D. Redekop Family LLC v. Utah County Real Estate LLC*, 2016 UT App 121, ¶ 20, 378 P.3d 109.

¶50   On the other hand, "where most people have sufficient experience with a subject, a lay opinion on that subject is by definition within the ken of the average bystander" and would

not require the witness's designation as an expert. *State v. Garcia-Lorenzo*, 2022 UT App 101, ¶ 66, 517 P.3d 424 (cleaned up), *cert. granted*, 525 P.3d 1263 (Utah Oct. 21, 2022) (No. 20220802). Knowledge within the ken of the average bystander includes, for example, knowledge as to whether wounds are fresh, *see State v. Hulse*, 2019 UT App 105, ¶ 35, 444 P.3d 1158, *cert. denied*, 456 P.3d 389 (Utah 2019); knowledge allowing comparisons between a shoe and shoeprints left at a crime scene, *see State v. Yalowski*, 2017 UT App 177, ¶ 37, 404 P.3d 53, *cert. denied*, 417 P.3d 580 (Utah 2018); and knowledge allowing an assessment of a person's state of intoxication, *see State v. Sellers*, 2011 UT App 38, ¶ 26, 248 P.3d 70.

¶51    Thus, whether Deputy's testimony amounted to improper expert testimony depends on whether his testimony was based on specialized knowledge. We accordingly consider the knowledge underlying Deputy's allegedly inappropriate testimony.

¶52    Deputy did not testify that the bruising on Roy's back was caused by repeated hits by a hammer. Instead, Deputy's testimony was that when people are hit with blunt objects, it typically leaves a mark "consistent with the shape of the object" but that "the angle of the blow," "the type of clothing" covering the area, or other such factors might affect the shape of the mark. Then, in relation to the "little circle" marks on Roy's back, Deputy testified that they "were consistent with the head of [a] hammer."

¶53    Such testimony relied on knowledge "within the ken of the average bystander." *Rothlisberger*, 2006 UT 49, ¶ 34. The average person has had sufficient life experience with bruising to know that the shape of a bruise is often similar to the shape of the object that hit the body and that the shape may, nonetheless, be distorted by the angle of the blow or nature of the contact. Additionally, an average bystander is familiar with the shape of a hammer head and could have looked at the pictures of Roy's injuries and testified as to whether the round marks visible were consistent

with that shape. None of this testimony required specialized knowledge.

¶54 Our determination on this point is supported by this court's opinion in *In re K.C.*, 2013 UT App 201, 309 P.3d 255. That case involved the question of whether marks on a child's buttock supported a determination that the child suffered "nonaccidental harm by the father spanking [the child] with his hand." *Id.* ¶ 18 (cleaned up). The father argued that "the evidence was insufficient to determine that a bruise even existed because no expert testified that the mark on [the child's] buttock was a bruise." *Id.* ¶ 14 (cleaned up). This court determined that such expert testimony was not required, reasoning that "whether the mark constituted a bruise and what caused it did not involve obscure medical factors but [were] within the common experience of laypersons." *Id.* ¶ 17 (cleaned up).

¶55 Because Deputy's testimony regarding the bruises on Roy's back did not rely on specialized knowledge but, instead, could have been provided by an average bystander, it was lay testimony, not improper expert testimony. As a result, Counsel's failure to object to this testimony on the ground that it was improper expert testimony did not amount to deficient performance, *see State v. Kelley*, 2000 UT 41, ¶ 26, 1 P.3d 546 ("Failure to raise futile objections does not constitute ineffective assistance of counsel."), and Kristy's ineffective assistance claim based on this point fails.

## II. Jailhouse Letter

¶56 Kristy argues that Counsel provided ineffective assistance by failing to object to the presentation of an inadmissible letter to the jury—both through Samantha's reading of the letter aloud during her testimony and through the letter's admission as an exhibit and resultant availability to the jury during its

deliberations. Kristy argues that the letter constituted hearsay for which no applicable exception existed.

¶57    For its part, the State does not argue that the letter was *not* inadmissible hearsay; instead, it argues that Counsel could have forgone an objection because the evidence was largely advantageous to the defense. Specifically, the State points out that the letter (1) reflected negatively on Samantha's character by exposing her romantic connection to a fellow inmate while she was married to another man, (2) made Roy and Sandra appear to be unsympathetic victims by providing evidence detailing the alleged underlying child molestation, and (3) supported the defense theory that Samantha belatedly identified Kristy as a participant in the assault in order for Samantha to get more favorable treatment in the case against her.

¶58    The State is correct that portions of the letter benefitted the defense by painting the victims and Samantha in a negative light and by providing some impeachment value. Thus, reasonable defense counsel could have wanted portions of the letter's contents to be before the jury; indeed, Counsel indicated that he planned to use the letter during his cross-examination of Samantha, which he then did. And while the letter also included a written account of Kristy's involvement in the attack—the introduction of which allowed the State to argue that once Samantha decided "to tell the whole story," she was "consistent about what everybody else did"—deciding between the pros and cons of allowing the jury to hear evidence that has the potential to cut both for and against a defendant's case is a quintessentially tactical decision, which we "will not question . . . unless there is no reasonable basis supporting [it]," *State v. Morley*, 2019 UT App 172, ¶ 30, 452 P.3d 529 (cleaned up), *cert. denied*, 462 P.3d 804 (Utah 2020); *see also State v. Bedell*, 2014 UT 1, ¶ 24, 322 P.3d 697 (holding that defense counsel's decision "to not object to the State's use of" evidence regarding prior bad acts by the defendant was not deficient performance where "defense counsel [had] made an

affirmative decision from the outset to utilize the [prior bad acts] evidence to attack the State's case"). Therefore, we cannot say that Counsel lacked any reasonable basis for believing that the potential advantage to be gained by putting Samantha's jailhouse romance, the details of Roy's alleged abuse of Son, and the plea-bargain incentive for Samantha to belatedly identify Kristy as one of the attackers would outweigh the potentially detrimental effect of allowing the jury to also receive a second, consistent account of the attack from Samantha.

¶59　Kristy contends that "[i]f there was anything in that letter that was useful [to the defense] for impeachment purposes, [Counsel] could have simply questioned Samantha about the few relevant lines without having the entire letter submitted into evidence." But if the State had not introduced the letter, there would have been no testimony about the jailhouse romance to impeach. Similarly, because Samantha's testimony regarding Roy's alleged abuse of Son was consistent with the letter's more detailed account of that abuse, that portion of the letter also would not have been admissible for impeachment purposes. *See* Utah R. Evid. 801(d)(1)(A) (defining a witness's prior statement that is *inconsistent* with the witness's testimony as non-hearsay that is admissible on cross-examination). Thus, Counsel could have reasonably believed that acquiescence to the admission of the letter as a whole would be the only way to place before the jury those portions of the letter that cast a particularly bad light on Samantha, Roy, and Sandra.

¶60　It is likewise far from clear that Counsel could have obtained admission of only that portion of the letter that did have impeachment value—the lines suggesting that Samantha belatedly identified Kristy as a participant in the assault not out of concern for Son but, rather, to get a more favorable plea deal for herself—without also triggering the simultaneous admission of the letter's account of Kristy participating in the attack. Rule 106 of the Utah Rules of Evidence, which "is often referred to as

the rule of completeness," "requires admission of those [parts of a writing] that are relevant and necessary to qualify, explain, or place into context the portion [of the writing] already introduced." *State v. Johnson*, 2016 UT App 223, ¶ 60, 387 P.3d 1048 (cleaned up), *cert. denied*, 393 P.3d 284 (Utah 2017); *see also* Utah R. Evid. 106 ("If a party introduces . . . part of a writing . . . , an adverse party may require the introduction, at that time, of any other part . . . that in fairness ought to be considered at the same time."). If Counsel had sought admission of the part of the letter that sheds light on Samantha's motivation for accepting a plea deal, the State likely would have sought the simultaneous admission under rule 106 of the part of the letter containing the account of the attack the State would have expected Samantha to testify to as part of the deal.

¶61　We need not decide whether the State would have succeeded in making such a request.[8] In this case, it is sufficient that Counsel had reason to want three different portions of the letter presented to the jury and could have reasonably believed that acquiescence to admission of the letter as a whole would be the only way to place at least two, and possibly all three, of those portions of the letter before the jury. And, as already noted, Counsel could have also reasonably concluded that the risks to Kristy of placing the letter's full contents before the jury—both orally during trial and in hard copy during deliberations—was outweighed by the potential benefits to Kristy of doing the same. Thus, Counsel's decision not to object to the letter's admission into evidence did not amount to deficient performance, and Kristy's claim of ineffective assistance on this ground fails.

---

8. Among other things, we recognize that "whether rule 106 can defeat other rules of evidence that work against admissibility, such as the rules on hearsay," or "is solely a rule of timing" is an open question in this state. *State v. Sanchez*, 2018 UT 31, ¶¶ 19, 24, 422 P.3d 866.

### III. Security Camera Video

¶62    Kristy argues that Counsel provided ineffective assistance related to his failure to show at trial additional portions of the security camera video. First, she contends that she received ineffective assistance because Counsel "litigated [her] case while knowing he was having difficulty receiving discovery in his email," which resulted in Counsel being unaware that the video existed until mid-trial. Second, she contends that she received ineffective assistance because Counsel "failed to ask for a continuance or a recess to fully watch the security camera footage so that he could properly assess the State's evidence" by watching the video in its entirety. Without deciding whether Counsel's performance was deficient in these regards, we conclude that Kristy has failed to show that the allegedly deficient performance prejudiced her defense. *See generally Honie v. State*, 2014 UT 19, ¶ 31, 342 P.3d 182 ("Because failure to establish either prong of the [*Strickland*] test is fatal to an ineffective assistance of counsel claim, we are free to address [a defendant's] claims under either prong.").

¶63    "To evaluate prejudice under *Strickland*, we assess counterfactual scenarios—that is, what would have happened but for the [allegedly] ineffective assistance." *State v. Garcia-Flores*, 2021 UT App 97, ¶ 27, 497 P.3d 847 (cleaned up), *cert. denied*, 502 P.3d 271 (Utah 2021). In other words, when evaluating prejudice, we must "consider not just what did happen at trial, but also what would have happened, including evidence that would have come in but didn't as a result of counsel's decisions." *Ross v. State*, 2019 UT 48, ¶ 76, 448 P.3d 1203 (cleaned up). Under such a counterfactual analysis, the "proof of ineffective assistance of counsel cannot be a speculative matter but must be a demonstrable reality." *State v. Rivera*, 2022 UT App 44, ¶ 43, 509 P.3d 257 (cleaned up). Thus, "speculation is not a substitute for proof of prejudice, and proof of prejudice may not be based purely upon a speculative matter." *Id.* (cleaned up).

¶64 The first relevant counterfactual scenario in this case is one in which Counsel reviewed the security camera video before trial. To satisfy the prejudice prong of *Strickland* in light of this counterfactual scenario, Kristy must show that if Counsel had reviewed the video prior to trial, there is a reasonable probability (1) that the later portion of the video would have been shown to the jury and (2) as a result, the jury would have returned a verdict more favorable to Kristy. On the record before us, Kristy has not made such a showing.

¶65 There is no evidence in the record indicating that Counsel would have shown the later portion of the video to the jury if he had reviewed the video before trial. The trial court found that Kristy "did not say anything to [Counsel] before . . . trial about owning a Ford Mustang" and that Kristy "did not tell [Counsel] that she was driving a Ford Mustang on the day or evening in question." Thus, even if Counsel had reviewed the video prior to trial, including the later portion in which a yellow car that arguably looks like a Ford Mustang can be seen driving toward Roy and Sandra's house after the attack ended, he would have had no reason to independently recognize the relevance of that portion of the video. And, thus, there is no reasonable probability that he would have shown it to the jury based on his own review of the video prior to trial.

¶66 Additionally, if Counsel had also shown the video to Kristy or explained its contents to her prior to trial, there is no evidence—even following the rule 23B remand—as to what she would have told Counsel or the jury regarding her Ford Mustang. If at that point Kristy would have neglected to tell Counsel that she owned a yellow Ford Mustang, or if she would have told him that she was not driving her Ford Mustang on the night of the attack, Counsel would, again, have had no reason to show the jury that later portion of the video. Only if Kristy had told Counsel that she owned and was driving a yellow Ford Mustang on the night of the attack, or that she owned a yellow Ford Mustang and could

not remember which car she was driving on the night of the attack, would Counsel have had any reason to show the jury the later portion of the video. Because we have no evidence to suggest what Kristy would have told Counsel or the jury about her Ford Mustang had she seen the video before trial, we can only speculate as to whether Counsel's review of the video prior to trial would have resulted in a reasonable probability of a more favorable outcome for Kristy.

¶67    For the foregoing reasons, Kristy's ineffective assistance claim based on Counsel's failure to review the video prior to trial fails.

¶68    The second counterfactual scenario we must consider is one in which Counsel requested additional time and reviewed the entire video after he learned about it at trial. But here again, Kristy has failed to demonstrate a reasonable probability that had Counsel reviewed the entire video after he learned about it during trial, he would have shown the later portion of the video to the jury or a reasonable probability that had the jury seen the later portion of the video, it would have returned a more favorable verdict for Kristy. The only material difference between this counterfactual scenario and the last one is that by the time Counsel learned of the video during trial, he had heard testimony that Kristy owned a Ford Mustang. Thus, if Counsel had reviewed the entire video (perhaps with Kristy) and seen the yellow sports car later in the video, he might have asked Kristy (or Kristy might have volunteered) whether she was driving her Mustang that night.[9] But again, there is no evidence to suggest what Kristy

---

9. The testimony Counsel had heard during trial about Kristy owning a Ford Mustang did not include testimony about the color of the Mustang. For that reason, if he had watched the entire video but without Kristy, it is just as likely that Counsel, after seeing a nondescript yellow sports car later in the video, justifiably would

(continued…)

would have told Counsel—or the jury—at that point, though Kristy could have provided such evidence through the 23B remand. Hence, as with the counterfactual scenario addressed above, we can only speculate as to whether Counsel's review of the entire video during trial would have resulted in Counsel seeking admission of the later part of the video.

¶69    A less likely but still potential option that Counsel might have pursued under this second counterfactual scenario would have been for him—after seeing in the video a car arguably similar to Kristy's Ford Mustang traveling toward Roy and Sandra's home immediately after the attack—to not ask Kristy whether she was driving her Mustang that evening and simply abandon his anticipated strategy of having Kristy testify in her own defense. Counsel could have then shown the jury the later part of the video and argued that the appearance of a car similar to Kristy's Mustang traveling toward Roy and Sandra's house immediately after the attack created a reasonable doubt as to whether Kristy was at the scene of the attack while the attack was happening.

¶70    However, adoption of this strategy would have required midtrial abandonment of any defense based on the timeline of Kristy and her husband's return from Colorado since only Kristy knew and recalled the details of that return trip. Moreover, the new strategy would have been vulnerable to attack on the grounds that (1) the video also showed an SUV that was arguably similar to Kristy's SUV following Samantha's car toward Roy and Sandra's house prior to the attack and (2) the yellow car in the later portion of the video "appears to be a different color and lack the striping of [Kristy's] Mustang," a fact about which Samantha would likely have been able to testify. For these reasons, we conclude that Kristy has not demonstrated that had Counsel reviewed the entire video during trial, he would have abandoned

_____

not have thought to ask her whether she was driving her Mustang that night.

the timeline strategy in favor of a strategy based on showing the later portion of the video. Nor has she demonstrated a reasonable probability that, even had Counsel made such a change in strategy, doing so would have yielded a different result.

¶71    Accordingly, Kristy's ineffective assistance claim based on Counsel not reviewing the entire video after learning about it at trial also fails.[10]

### IV. Cumulative Error

¶72    Kristy additionally raises a cumulative error argument, urging us to consider the combined prejudicial effect of the several alleged failures of Counsel. For purposes of our analysis above, we have assumed that Counsel performed deficiently in his actions related to the security camera video, but we have otherwise concluded that Counsel did not perform deficiently. As to Counsel's actions related to the security camera video, we have determined that whether Counsel's conduct even had the potential to impact the outcome for Kristy is purely speculative. And because there are no additional errors by Counsel to cumulate, Kristy's cumulative error argument fails. *See State v. Torres-Orellana*, 2021 UT App 74, ¶ 30 n.11, 493 P.3d 711 (holding that where there was "no other error with which to cumulate

---

10. In her motion for a remand under rule 23B, Kristy also suggests that Counsel was ineffective in not conducting a reasonable investigation, which she submits would have alerted him to the fact that Kristy owned a yellow Ford Mustang. But even assuming additional investigation would have put Counsel on notice of Kristy's yellow Mustang, the record is still devoid of evidence suggesting that Kristy would have claimed to have been driving her Mustang on the night of the attack. Thus, to the extent that Kristy's investigation argument is a separate assertion of ineffective assistance, she has again failed to show prejudice resulting from the allegedly deficient performance.

[t]rial [c]ounsel's presumed . . . errors," which had already been deemed non-prejudicial, "the cumulative error doctrine [did] not apply").

CONCLUSION

¶73 Counsel's conduct in not objecting to Deputy's opinion testimony and in not objecting to admission of the jailhouse letter did not amount to deficient performance. And even if Counsel's conduct in not taking additional action related to the security camera video was deficient, any resulting prejudice from that action is purely speculative. Thus, each of Kristy's claims of ineffective assistance of counsel fails, as does her cumulative error argument. Accordingly, we affirm.

_____