**2024 UT App 150**

# THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF A.D.-C.,
A PERSON UNDER EIGHTEEN YEARS OF AGE.

A.D.-C.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20221120-CA
Filed October 24, 2024

Fourth District Juvenile Court, Provo Department
The Honorable F. Richards Smith
No. 1208680

Douglas J. Thompson and Margaret P. Lindsay,
Attorneys for Appellant

Sean D. Reyes and Emily Sopp,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES RYAN D. TENNEY and JOHN D. LUTHY concurred.

HARRIS, Judge:

¶1    A.D.-C. (ADC), a sixteen-year-old juvenile, borrowed his father's Cadillac Escalade one night and took it for a spin, accompanied by a friend. At the time, ADC had a learner permit but not a driver license. The ride ended when ADC took a turn too fast, rolled the vehicle, and crashed through a backyard fence. The State filed a delinquency petition against ADC, alleging that he had taken actions constituting the crimes of reckless driving and driving without a license. ADC admitted that he had been driving without a license, but he contested the reckless driving

charge. After a bench trial, however, the juvenile court found that ADC had indeed been driving recklessly, and it adjudicated him delinquent on that charge.

¶2　ADC now appeals that determination, asserting that some of the testimony offered by responding police officers was improperly admitted, and that the evidence was insufficient to support a determination that he violated the reckless driving statute. We reject ADC's assertions and affirm his adjudication.

BACKGROUND

¶3　One evening after dark, police received a report that there had been a vehicle "rollover" near the local high school. Two officers arrived at the scene, and they found a Cadillac Escalade that had come to rest "in someone's yard," "right where a fence" used to be, right-side up but "turned the opposite direction of the travel." The vehicle had extensive "damage to [its] top and sides," and had "scraping" on its chrome hubcaps. Officers also observed damage to nearby shrubbery, trees, and fences. And on the pavement, the officers observed "scrape marks from the vehicle" as well as "extensive skid marks," which they deduced were "from the tires" because there was "rubber residue on the road."

¶4　The accident occurred at a relatively large intersection, and the posted speed limit on the more arterial of the two intersecting roads was 45 miles per hour. Both of the intersecting roads had at least one lane of travel in each direction as well as a shared turn lane in the middle. The officers located ADC at the scene, who told them that he had been "traveling southbound" on the busier road and that the vehicle's "steering" or "front tire" had "locked up," causing him to lose control of the vehicle. The officers also learned that ADC did not have a driver license, although he did have a learner permit. Fortunately, neither ADC nor his passenger was seriously injured, despite the severity of the crash.

¶5      From ADC's statements and their own observations at the crash scene, the officers concluded that ADC had been traveling southbound at or near 45 miles per hour and had attempted to turn left (eastbound) onto the cross-street, but that he had not successfully navigated the turn and had rolled the vehicle over and crashed through a fence and into the yard. At the scene, officers cited ADC for "reckless driving" and for "violation of [his] learner's permit."

¶6      One month later, the State filed a delinquency petition against ADC, asserting that he had taken actions that constituted the crimes of reckless driving and driving without a license. As the case proceeded, ADC admitted to the unlicensed driving charge, but he elected to contest the reckless driving charge, and the case moved toward trial.

¶7      A few months later, the juvenile court held a half-day bench trial to consider the reckless driving charge. At the outset, ADC's attorney (Counsel) indicated that the State had told him that it would not be offering any expert testimony and that he intended to object to any testimony that he thought constituted expert testimony.

¶8      In support of its case, the State called only two witnesses: the officers who had responded to the crash scene. The first officer (Officer 1) offered his observations of the scene, including a description of the location and positioning of the vehicle, the skid marks on the road, the statements ADC had made, and the general layout of the intersection. Officer 1 also testified that when the vehicle was pulled onto a tow truck, the wheels appeared intact and were not locked in any position, leading him to conclude that the vehicle "had not locked up." Counsel lodged no objection to any of this testimony.

¶9      At one point, the State asked Officer 1 how, in his opinion, the vehicle could have come "to rest on its wheels" facing the wrong direction in the yard. At this, Counsel objected, arguing

that the question called for expert testimony. The court overruled the objection, stating that it would "allow the . . . testimony as to what was observed and reasonable conclusions from those observations based upon training and [experience]." Officer 1 then testified that, in his view, ADC had attempted to take a turn that "had exceeded the speed limit" and that the vehicle had "rolled, hit the curb, and then flipped itself back upright" and came to rest in the yard. And he noted "the velocity that must have occurred in order for that vehicle to roll and crash through trees, fences and end up in somebody's backyard."

¶10    Later, the State asked Officer 1 which individual traffic citations could have been issued to ADC under the circumstances. Officer 1 stated that, among other things, ADC could have been cited for speeding, failing to maintain lane of travel, making an improper turn, failing to maintain control of the vehicle, and driving carelessly. While Officer 1 acknowledged on cross-examination that he did not observe ADC speeding, he clarified that "the skid marks and the totality [of the circumstances] would suggest [ADC] was speeding."

¶11    Officer 2 likewise offered his observations of the accident scene, which testimony came in without objection. Later, though, Officer 2 testified about the particulars of the skid marks he observed on the pavement, stating that some of the marks were "yaw marks." He explained that yaw marks are a type of skid mark that "almost look like half-moons" and that these marks indicate that "the vehicle is sliding sideways," usually as a result of "excessive speed." At this point, Counsel objected, asserting that this testimony about yaw marks was expert testimony that had not been previously disclosed and for which insufficient foundation had been laid. The court overruled this objection. Officer 2 then added that he had learned about yaw marks from instruction he had received "in the police academy."

¶12    Shortly thereafter, the State asked Officer 2 for his opinion about "what [he thought] happened." Counsel lodged no objection to this question. In response, Officer 2 stated, "I believe the vehicle was trying to make a left-hand turn to go eastbound on [the cross-street] and was going at a high rate of speed and couldn't control the vehicle and rolled."

¶13    The State also asked Officer 2 whether drivers have less control over their vehicles at higher speeds. When Officer 2 answered in the affirmative, Counsel objected, arguing that the State was once again calling for expert testimony. In response to this objection, the State asked a series of questions intended to offer additional foundation for Officer 2's response, and Counsel did not thereafter renew the objection. The court was therefore never asked to make an ultimate ruling on the objection. Officer 2 eventually offered a response to the original question, testifying that it "[a]bsolutely" becomes more difficult to turn a vehicle at high speed.

¶14    As with Officer 1, the State also asked Officer 2 what individual citations could have been given to ADC, and Officer 2 responded that his "three top ones would be speeding, improper turn, and failure to maintain control of the vehicle."

¶15    After eliciting testimony from the two officers, the State rested its case. ADC then called his parents as defense witnesses, and he attempted to elicit testimony aimed at demonstrating that the vehicle was mechanically unreliable. The parents testified that the family had owned the vehicle since 2006 and that about "[f]our years ago" the vehicle's "steering wheel became very stiff," making it difficult to turn. To fix this problem, ADC's father had replaced the power steering pump twice, most recently the year before the crash. He acknowledged, however, that since the latest pump replacement, the vehicle's steering had been working just fine as far as he knew. And just two weeks before the crash, ADC's father had replaced the rear brakes and brake discs. He further

testified that at the time of the accident one of the vehicle's four tires was a spare tire.

¶16 In its closing argument, the State argued that ADC had committed reckless driving in two different ways. First, it asserted that ADC had been driving the vehicle in general "willful and wanton disregard for the safety of persons or property." *See* Utah Code § 41-6a-528(1). Second, the State contended that ADC had committed at least three separate traffic violations during the incident. *See id.* § 41-6a-528(2)(b). The State argued that these violations included speeding, not staying in a lane, making an improper turn, and not remaining in control of the vehicle.

¶17 In response, Counsel argued that ADC had not been driving with a general "willful and wanton disregard" for the safety of others and that he had not committed three "separate and distinct" traffic violations. In particular, Counsel argued that all the alleged individual traffic violations occurred at roughly the same time and during the same set of acts, and that the State's asserted violations were therefore "all the same thing."

¶18 At the conclusion of the trial, the juvenile court concluded that ADC had committed three separate traffic violations in rapid succession, stating as follows:

> [T]he reasonable inference that is drawn is that there was excessive speed for the circumstances. [ADC] [m]ay have only been traveling the speed limit which is not a problem. You can travel the speed limit. But if you're trying to make a turn at 45 miles an hour (the speed limit there), that is excessive. So with . . . all of that evidence it becomes obvious that . . . speed was involved, that there was an attempt to make a turn improperly, and a failure . . . to remain in the lane of travel.

The court found "no evidence whatsoever that there was any . . . problem caused by having a spare tire" on the vehicle, and it rejected ADC's assertion that a steering problem caused the accident. The juvenile court explained that "having a problem with the turning mechanism . . . does not explain why the vehicle would have flipped, rolled, [and] traveled as it did."

¶19    On this basis, the court adjudicated ADC delinquent on the reckless driving charge; the court did not address whether ADC had exhibited a general "willful or wanton disregard for the safety of persons or property." *See* Utah Code § 41-6a-528(1). That same day, the court sentenced ADC to probation and ordered him to complete twenty hours of community service.

ISSUES AND STANDARDS OF REVIEW

¶20    ADC now appeals, and he raises two issues for our consideration. First, ADC challenges the juvenile court's decision to overrule his objections to the officers' trial testimony, lodged on the ground that the officers were offering improper expert testimony. We review a trial court's determination that a witness's testimony was not expert testimony for "abuse of discretion." *State v. Rothlisberger*, 2006 UT 49, ¶ 8, 147 P.3d 1176. "Abuse of discretion occurs only if it can be said that no reasonable person would take the view adopted by the [trial] court." *State v. Sanchez*, 2017 UT App 229, ¶ 2, 409 P.3d 156 (quotation simplified).

¶21    Second, ADC asserts that the evidence was insufficient to support the court's determination that he committed reckless driving. "When reviewing a juvenile court's decision for sufficiency of the evidence, [an appellate court] must consider all the facts, and all reasonable inferences which may be drawn therefrom, in a light most favorable to the juvenile court's determination," and we reverse "only when it is against the clear weight of the evidence, or if the appellate court otherwise reaches

a definite and firm conviction that a mistake has been made." *In re V.T.*, 2000 UT App 189, ¶ 8, 5 P.3d 1234 (quotation simplified).

ANALYSIS

## I. The Officers' Testimony

¶22 ADC's first challenge is to the juvenile court's decision to overrule his objections to portions of the officers' trial testimony that he asserts was undisclosed expert testimony. Officer 2's challenged testimony about "yaw marks" may well have been expert testimony. But even assuming that this testimony was improperly admitted, we reject ADC's challenge, because the rest of the officers' testimony was properly admitted lay testimony and because ADC has not shown a reasonable probability of a different result in the absence of the yaw mark testimony. We discuss ADC's challenges to each officer's testimony in turn.

### A. Officer 1's Testimony

¶23 ADC challenges the admission of only one part of Officer 1's trial testimony: his opinion as to how the vehicle could have ended up turned the wrong way in a residential yard. ADC contends that this testimony constituted improper and undisclosed expert testimony. We disagree.

¶24 "[T]he test for determining whether testimony must be provided by an expert is whether the testimony requires that the witness have scientific, technical, or other specialized knowledge; in other words, whether an average bystander would be able to provide the same testimony." *State v. Rothlisberger*, 2006 UT 49, ¶ 34, 147 P.3d 1176. Indeed, a "lay witness may testify in the form of fact or opinion to information within her personal knowledge or perception when it is helpful to the finder of fact and it is 'not based on scientific, technical, or other specialized knowledge.'" *State v. Sellers*, 2011 UT App 38, ¶ 26, 248 P.3d 70 (quoting Utah R.

Evid. 701). Thus, the admissibility of lay opinion testimony often turns on whether the opinion falls "within the ken of the average bystander." *Rothlisberger*, 2006 UT 49, ¶ 34.

¶25 Applying these principles, Utah courts have deemed lay opinions within the ken of the average bystander, and therefore admissible, in various circumstances, including opinions about whether a person is intoxicated, whether moans sound as though they were associated with sexual pleasure, whether footprints and shoeprints appear to be similar, and whether a victim's wounds are fresh. *See State v. Ellis*, 748 P.2d 188, 190–91 (Utah 1987) (similarity of footprints); *State v. Garcia-Lorenzo*, 2022 UT App 101, ¶¶ 66–67, 517 P.3d 424, *cert. granted*, 525 P.3d 1263 (Utah 2022) (moans of pleasure or pain); *State v. Hulse*, 2019 UT App 105, ¶ 35, 444 P.3d 1158 (freshness of wounds); *State v. Yalowski*, 2017 UT App 177, ¶¶ 32, 39, 404 P.3d 53 (similarity of shoeprints); *Sellers*, 2011 UT App 38, ¶ 26 (intoxication).

¶26 In this case, Officer 1 testified, based on his observations at the crash scene, that ADC had attempted to take a turn that "had exceeded the speed limit" and that the vehicle had "rolled, hit the curb, and then flipped itself back upright" and came to rest in the yard. He further made note of "the velocity that must have occurred in order for that vehicle to roll and crash through trees, fences and end up in somebody's backyard."

¶27 The juvenile court did not abuse its discretion by deeming this testimony an admissible lay opinion, because the opinion Officer 1 gave is within the ken of the average bystander. Just as most people have sufficient experience with intoxicated people or footprints, most people have sufficient experience with car travel and accidents to offer basic opinions, based on their observations, about how a car ended up in a particular location. Although the juvenile court mentioned, in passing, that Officer 1's opinions may have been based on his "training and [experience]," Officer

did not actually so testify and, in our view, the testimony in question did not require any specialized training or experience.[1]

---

1. In this vein, ADC complains that the State relied on Officer 1's "training and experience" in resisting Counsel's objection to the testimony, and notes that the juvenile court mentioned Officer 1's "training and [experience]" in overruling the objection. In particular, ADC asserts that Officer 1's "considerable experience" operates to "legitimate" the lay testimony and might cause a factfinder to "give those conclusions weight beyond what would normally be given to a lay witness's opinion testimony." In our view, ADC raises a legitimate concern: litigants ought not be able to *unfairly* cloak a lay opinion in expert witness garb by emphasizing the "lay" witness's extensive training and experience. By the same token, however, the proponent of the testimony should be allowed to introduce at least some foundation that the lay witness has sufficient facility with the subject matter to be able to offer a credible opinion. In the end, however, ADC's concern does not go to the opinion's admissibility; a lay opinion is admissible if it meets the requirements of rule 701 of the Utah Rules of Evidence, regardless of whether it comes from a high-information witness. *See State v. Sellers*, 2011 UT App 38, ¶ 26, 248 P.3d 70 (stating that a police detective's "testimony regarding [the defendant]'s state of intoxication . . . could properly come in under rule 701 as lay opinion testimony so long as it was helpful to the jury and based on her own perceptions"). The remedy in these situations is therefore not wholesale exclusion of the testimony but, instead, a careful assessment—with the principles of rule 403 of the Utah Rules of Evidence in mind—of how much foundation the proponent of lay testimony should be allowed to offer, and evaluation of whether to instruct the jury that the witness is testifying as a lay witness and not as an expert based on "training and experience." In this case, ADC lodged no separate objection—

(continued…)

¶28 It is important to our conclusion here that Officer 1's testimony was fairly cursory and non-technical, and—as the juvenile court noted—was a far cry from "the realm of [accident] reconstruction" testimony. When a vehicle has damage to its side and top and to its chrome wheels, and when there are skid marks and scrape marks on the pavement, it does not require any specialized training or experience to conclude that the vehicle was traveling too fast, lost control, rolled over and ended up in its terminal location.

¶29 On this basis, we reject ADC's challenge to the admissibility of Officer 1's lay opinion about how the vehicle came to rest in the residential backyard.

### B. Officer 2's Testimony

¶30 ADC challenges the admission of two parts of Officer 2's testimony: (1) his opinion that drivers have less control over their vehicles at higher speeds than they do at lower speeds, and (2) his opinion that some of the skid marks were "yaw marks" that indicated the vehicle had been "sliding sideways" as a result of "excessive speed." We discuss these challenges in turn.

¶31 The juvenile court did not abuse its discretion in allowing Officer 2 to offer the opinion that drivers have less control over their vehicles at higher speeds. In this context, this opinion is permissible lay testimony, because most people have sufficient experience with car travel to be able to intuit that it is easier to control a vehicle and keep it in the proper lane of travel when moving at slow speeds than when moving at high speeds. This

apart from his objection to the admissibility of the testimony—to the specific emphasis of Officer 1's "training and experience" and, in this case that was tried to the bench, we discern no prejudice from that language in any event.

opinion was within the ken of the average bystander and was therefore not objectionable.[2]

¶32   We resolve ADC's challenge to Officer 2's "yaw marks" testimony on a different ground. ADC asserts—with considerable force—that this testimony constitutes expert testimony because average bystanders do not have much knowledge about the specifics of skid marks, including yaw marks. But even assuming—without deciding—that the juvenile court abused its discretion by allowing Officer 2 to opine about yaw marks, any such error was harmless on this record.

¶33   Not every trial error regarding the admission of evidence requires reversal. Indeed, such errors "require[] reversal only if a review of the record persuades the appellate court that without the error there was a reasonable likelihood of a more favorable result for the defendant." *State v. Jones*, 2020 UT App 161, ¶ 14, 478 P.3d 1055 (quotation simplified); *see also State v. Ellis*, 2018 UT 2, ¶ 42, 417 P.3d 86 ("Prejudice analysis is counterfactual. To decide whether a trial affected by error is reasonably likely to have turned out differently we have to consider a hypothetical—an alternative universe in which the trial went off without the error."). Thus, to assess whether the admission of Officer 2's yaw

---

2. We assume, for purposes of this discussion, that ADC preserved this issue for our review on appeal. As noted, ADC initially lodged an objection to Officer 2's opinion about higher speeds but did not renew the objection after the State laid additional foundation, and the juvenile court never actually made a ruling on the objection. But we need not further concern ourselves with preservation here because we reject ADC's challenge to this specific testimony on its merits. *See State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415 (stating that where "the merits of a claim can easily be resolved in favor of the party asserting that the claim was not preserved, we readily may opt to do so without addressing preservation" (quotation simplified)).

mark testimony can constitute reversible error, we must imagine an alternative trial in which all of the rest of the evidence came in as in the actual trial, but with one difference: the juvenile court did not hear Officer 2's yaw mark testimony. And with that trial in mind, we must consider whether it is reasonably likely that the court would have reached a different conclusion.

¶34 On this record, a different conclusion is not reasonably likely, even in the absence of the yaw mark testimony. The other evidence indicating that ADC had rolled his vehicle due to excessive speed and inexperience was overwhelming. After all, the vehicle had sustained severe damage, including to its top and sides, and had ended up in a yard resting in the opposite direction than it had been traveling. The court did not need Officer 2's yaw mark testimony to reach the rather intuitive conclusion that the vehicle had rolled over while making a turn at excessive speed and that it had therefore at some point been moving sideways. We also note that, in its explanation of its conclusions, the juvenile court made only passing mention of yaw marks—in the context of commenting on the presence of skid marks on the pavement— and does not appear to have meaningfully relied on Officer 2's specific opinion about the yaw marks.

¶35 Accordingly, for these reasons, we reject ADC's challenges to Officer 2's testimony.

## II. Sufficiency of the Evidence

¶36 Finally, ADC brings a sufficiency-of-the-evidence challenge, asserting that the evidence presented does not support the juvenile court's determination that ADC violated the reckless driving statute. That statute states, as a general matter, that "[a] person is guilty of reckless driving who operates a vehicle in willful or wanton disregard for the safety of persons or property." Utah Code § 41-6a-528(1). And the statute goes on to specify that "'willful or wanton disregard for the safety of persons or property' includes . . . committing three or more traffic violations

. . . in a series of acts occurring within a single continuous period of driving covering three miles or less in total distance." *Id.* § 41-6a-528(2). Thus, as applicable here, there are two possible pathways by which ADC could be deemed to have committed the crime of reckless driving: (1) by exhibiting a general "willful or wanton disregard for the safety of persons or property," or (2) by committing at least three separate traffic violations in a single continuous period within three miles. *See* § 41-6a-528; *see also State v. Young*, 2015 UT App 286, ¶¶ 14–15, 364 P.3d 55 (affirming a conviction for reckless driving due to a general willful or wanton disregard for the safety of persons or property). Indeed, the State argued to the juvenile court that ADC should be considered delinquent under both of these pathways. But the juvenile court relied entirely on the second theory—that ADC had committed three traffic violations—and made no finding about general willful or wanton disregard. Specifically, the court found that ADC had been speeding, had made an improper turn, and had failed to remain in his lane of travel.

¶37 ADC challenges the juvenile court's determination that he committed three separate traffic violations. The State responds by asserting that ADC violated at least three traffic laws during the rollover accident, and alternatively invites us to affirm on the ground that ADC "committed reckless driving through willful and wanton disregard."

¶38 We elect to affirm on the alternative basis suggested by the State. We can, of course, affirm a trial court's decision on any "legal ground or theory apparent on the record, even though such ground or theory differs from that stated by the trial court to be the basis of its ruling or action." *Bailey v. Bayles*, 2002 UT 58, ¶ 10, 52 P.3d 1158 (quotation simplified). And this principle rings especially true in juvenile delinquency cases, because in such cases the court is not required to make any findings at all. *See* Utah R. Juv. P. 44(a) (stating that "findings of fact shall not be necessary" in "cases concerning any minor who has violated any

federal, state, or local law or municipal ordinance"); *see also In re J.R.H.*, 2020 UT App 155, ¶ 8 n.4, 478 P.3d 56 (observing that the juvenile court had not made any findings beyond simply adjudicating the juvenile delinquent, but citing rule 44(a) and noting that "none were required"). Indeed, in this case, the juvenile court—presumably referring to rule 44(a)—recognized that it was "not required to make findings," but it indicated that it wanted to "try and explain" its decision anyway. We applaud the court's effort, in furtherance of procedural fairness, to offer an explanation to the parties of the basis for its decision, and we observe that this will often turn out to be a useful practice even in cases where it is not required. But because the juvenile court was not required to make findings, our review of the record is plenary and is not cabined by the bonus explanation the court gave as the basis for its ruling. As already noted, our review takes into account "all the facts, and all reasonable inferences which may be drawn therefrom," and construes those facts and inferences "in a light most favorable to the juvenile court's determination," and we reverse only when the court's decision "is against the clear weight of the evidence, or if the appellate court otherwise reaches a definite and firm conviction that a mistake has been made." *In re V.T.*, 2000 UT App 189, ¶ 8, 5 P.3d 1234 (quotation simplified). In other words, if the evidence presented at trial, coupled with reasonable inferences drawn therefrom, supports the conclusion that ADC operated his vehicle "in willful or wanton disregard for the safety of persons or property," then we will affirm the juvenile court's adjudication, even if we end up arriving at that conclusion by a somewhat different path than the juvenile court did.

¶39 And when we examine the evidence presented, it supports the conclusion that ADC committed reckless driving. Although ADC was a relatively inexperienced driver, his age as well as his possession of a learner permit demonstrate sufficient experience to impute to him an understanding that a car cannot safely make a 90-degree turn on a city street while moving at 45 miles per hour. Thus, even if he was not driving in excess of the posted speed limit

as he drove down the street, he was driving too fast for the existing conditions when he approached and made the left-hand turn onto the cross-street at or near 45 miles per hour. *See* Utah Code § 41-6a-601(1) (stating that a "person may not operate a vehicle at a speed greater than what is reasonable and prudent under the existing conditions," including when "approaching and going around a curve"). Largely because of his choice to take the turn at an excessive speed, he was unable to control his vehicle, and he rolled it through a fence and into a nearby resident's yard. These actions obviously created a real risk of danger not only for ADC and his friend, but also for other motorists as well as the residents of the property where the vehicle came to rest. Under these circumstances, the evidence supports the conclusion that ADC was operating his vehicle in willful or wanton disregard for the safety of persons or property, and thus supports the juvenile court's determination that ADC committed reckless driving.

¶40    On this basis, then, we conclude that the juvenile court's ultimate adjudication was not against the clear weight of the evidence and is therefore not subject to reversal on appeal.

CONCLUSION

¶41    For the most part, the juvenile court did not abuse its discretion in overruling ADC's objections to portions of the officers' testimony. And ADC has not demonstrated that he was prejudiced by admission of Officer 2's testimony about yaw marks. Finally, the record contains sufficient evidence to support the juvenile court's ultimate delinquency adjudication.

¶42    Affirmed.

_____